THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LESLIE WILLIAMS, Defendant-Appellant.

First District (6th Division) No. 1—88—0032

Opinion filed February 8, 1991.

---

LaPORTA, J., dissenting.

EGAN, J., specially concurring.

Randolph N. Stone, Public Defender, of Chicago (Karen E. Tietz, Assistant Public Defender, of counsel), for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Noreen M. Daly, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

Following a jury trial, defendant Leslie Williams was found guilty of murder and armed robbery. He was sentenced to a term of 40 years for murder and seven years for armed robbery, the sentences to run concurrently. Codefendant Robert Weatherly was tried simultaneously in a bench trial and found not guilty. The issues raised on appeal are: (1) whether defendant was denied a fair trial when the State showed the life and death witness murder scene photographs of his sister which elicited an emotional reaction in the presence of the jury; (2) whether the trial judge's hostility toward defense counsel prejudiced the jury against defendant's case; (3) whether the rebuttal testimony of the fingerprint examiner was improper and prejudicial to defendant; (4) whether the State failed to prove defendant's guilt beyond a reasonable doubt; and (5) whether defendant's 40-year sentence was excessive.

Edward Triplett testified for the State that he was the brother of the victim, Overzenia Torry. He last spoke with the victim on the evening of November 29, 1986. When he was unable to contact her by telephone throughout the next day, he went to her apartment, which was located at 7756 South Michigan Avenue in Chicago. When Triplett arrived at the apartment, he found the door unlocked. Inside the apartment he found his sister lying in the doorway between the dining room and bathroom covered with dried blood. She was not breathing, and there was a knife which was partially under her body. Triplett also noted that the telephone was off the hook and that the apartment was in disarray. On further inspection, he determined that two television sets, stereo equipment, jewelry and money were missing. Triplett was then shown a series of photographs of the victim as well as the condition of the apartment after the incident. When Triplett saw the first photograph, he replied "Oh my God." He then identified the photograph as that of his sister. At this point, defense counsel requested that the court order the State to stipulate that the witness could identify his sister in the photographs. Defense counsel acknowledged that he had been shown the photographs but stated that he had not made a previous offer to stipulate because he did not know that the State would show the photographs to this witness. The

court denied defense counsel's request, finding it untimely. The court also stated that it could not order either party to stipulate to anything. Triplett viewed the remainder of the photographs and stated that they accurately reflected the scene of the crime as he saw it on November 30, 1986. Defense counsel did not cross-examine the witness, but counsel for codefendant did cross-examine him in the presence of the jury.

Mary Lou Paul testified that her apartment was located across the hall from the victim. On the evening of November 29, 1986, some time after 11 p.m., Paul stated that she heard a door bell ring. She then heard a male voice say the words "Frances," "son" and "New York." The door closed and she heard nothing else.

Denise Saunders testified that she lived on the first floor of the same building and that her apartment was directly below that of the victim. On November 29, 1986, she arrived home at around 10:30 p.m. Shortly thereafter, a man rang the bell of her apartment and asked for "Zek" (victim's nickname). She told him that no one by that name lived in the apartment. Saunders further testified that around one hour later, a friend of hers named Pamela Haynes knocked on her door. When she opened the door for Haynes she saw a man dressed in jeans, a jacket and hat proceed up the stairs. About 30 minutes later, Saunders stated that she heard a loud noise which appeared to come from the apartment directly above her.

Pamela Haynes testified that when she arrived at the entrance of the building she saw a man coming down the inside stairway. Both he and another man who was in the hallway opened the door for her. She stated that she detected the odor of alcohol as she walked past them. As Haynes walked up to Saunders' apartment, one of the men came up the stairs behind her and continued up to the second floor. She stated that he was wearing a black jacket and a cap. While she was in Saunders' apartment, she heard fighting and then a loud noise in the apartment directly above her.

Bertha Robinson testified that she was the owner of the Pink Lady Lounge on 79th Street in Chicago. She stated that the victim had worked for her in 1970, and that a Frances Williams was also employed by her during the same time period. She further stated that Frances Williams had a son named Leslie. At around 7:30 p.m. on November 29, 1986, defendant arrived at the lounge with a man Robinson could not identify. Robinson stated that defendant was at the lounge at 9:30 p.m. when she left but was not there when she returned at 3 a.m.

Detective George Karl testified that on November 30, 1986, he was assigned to investigate the victim's murder. When he arrived at the scene of the crime, he found the victim lying face up on the floor. There was a sash-type cord around her neck and multiple stab wounds to her neck. After speaking with some of the residents of the building, Karl looked in the victim's personal phone book for the name of Frances' son. He found two listings for Frances Williams. One was listed as living in Calumet City, and one was listed at 8041 South State Street in Chicago. Around this time, Sergeant Jones arrived. He stated that he had not been assigned to the case but was a personal friend of the victim. He informed Karl that the victim had worked with a Frances Williams at the Pink Lady Lounge. Karl then went to Calumet City, interviewed Frances Williams and determined that she had three sons, Leslie, Lavane and Eugene, but did not know where they were at that time. Several days later, Karl received a radio communication that defendant was at the police station with Sergeant Jones. Karl arrived at the station, and he and Detectives Ryan, Plenta and Pesavento spoke with defendant. Defendant told the officers that he went to the victim's apartment building with Robert Weatherly. While Weatherly waited in the car, defendant went up to the apartment to try to sell the victim telephone answering equipment. During this conversation, defendant referred to the victim as "Zekee." After this conversation, defendant again spoke to Sergeant Jones for several minutes. Defendant then had a second conversation with the other officers and made the statement "I would not kill that woman, she was like a mother to me." He then told the officers that when he knocked on the door of the victim's apartment, a female Puerto Rican opened the door. In the apartment, there were also two male Puerto Ricans standing by the victim who was lying on the floor. One of the men was holding a shotgun. He pointed the gun at defendant and threatened to shoot him if defendant told anyone what he saw. After this conversation, defendant was arrested and charged with the victim's murder.

Murial Eason testified that in November and December 1986, defendant lived with her and her two children at 3565 South Princeton in Chicago. She stated that on November 30, 1986, defendant returned home sometime in the morning. Several police officers searched Eason's home on December 2, 1986. They also asked if defendant lived there and if any of his clothing was in the apartment. Eason gave them a sweater, shirt and trousers which she identified in court. However, she was unable to identify a hat the State presented to her as one that defendant wore. Eason also stated that she did not

know whether the clothing taken from her apartment was what defendant was wearing when he returned to the apartment on November 30, 1986.

Detective Angelo Pesavento testified that he was present during a conversation between Eason and the prosecutor one week prior to the trial, and that he heard Eason say that defendant was wearing the clothing recovered by the police when he came home on the morning of November 30, 1990.

Pamela Fish testified as an expert in the field of serology and electrophoresis. The subject matter of her testimony was blood samples taken from defendant, the knife found near the victim's body and from the dining room floor of the victim's apartment. She stated that, based on her analysis, the sample of blood from defendant was different than the sample from the dining room floor. The sample from the weapon was also different from defendant's sample but consistent with the blood on the dining room floor. Fish then testified that she found a bloodstain on the inside lining of the left pocket of the pair of trousers belonging to defendant. She stated that the bloodstain was different than the sample from defendant but consistent with the sample from the dining room floor.

The forensic pathologist testified that the victim died from multiple stab wounds in the face and neck area.

Sergeant Walter Jones testified that he spoke with defendant's mother and asked her to have her son Leslie give himself up. On December 5, 1986, defendant contacted him and agreed to go to the police station with him. When defendant was riding to the station with Jones, he denied going to the victim's apartment on November 29 or 30, 1986. However, when Jones had a private conversation with defendant at the police station, defendant first stated that some Puerto Ricans with shotguns had killed the victim and threatened defendant because he owed them money. When Jones responded that this sounded like "bullshit" to him, defendant started crying, dropped his head in his hands and said "I didn't mean to do it. She was like a mother to me." On cross-examination, Jones acknowledged that this conversation was not in any police reports.

The photographs of the scene of the crime, defendant's clothing and the blood samples were then admitted into evidence.

The only witness to testify for the defense was Officer Phillip Montalbano, a latent fingerprint examiner. He compared the fingerprints and palm prints of defendant with those found at the scene of the crime. His conclusion was that defendant's prints were different than those found at the scene. On cross-examination, he stated that

whether touching will leave a print is dependant on the amount of sweat secreted, the smoothness and temperature of the surface, and whether the person is wearing gloves.

In rebuttal, the State offered the testimony of Officer Thomas Gimley, a latent fingerprint examiner, who stated that no prints were found on the knife found near the victim's body. Defense counsel objected to the rebuttal evidence.

Defendant contends that he was denied a fair trial when the State showed the life and death witness photographs of the murder scene because the witness' reaction focused the jury's attention on sympathy for the victim, as opposed to evaluating the evidence of defendant's guilt. The victim's brother, Edward Triplett, was called by the State as a life and death witness. He testified to the events leading up to and including his discovery of his sister's body. At that point, the State showed Triplett a photograph of his sister's body at the scene of the crime, and he responded "Oh my God. This is my sister." At this point, defense counsel offered to stipulate that the witness could identify his sister from the photographs so that he would be spared any undue grief. However, the State did not accept defense counsel's offer, and the court stated that it could not force the State to make the stipulation. Triplett then identified the remaining photographs as those of his sister's body and the murder scene as he saw it on November 30, 1986. In response to this question by the State, Triplett replied "Yes. I'll never forget it." In arguing this issue, defendant does not claim that the admission of the photographs was error, but that the error was committed when the State showed them to the victim's brother which elicited an emotional reaction in front of the jury.

■ The State is permitted to introduce full proof of the crime charged in the indictment and to call life and death witnesses to identify the victim and the fact of her death. (*People v. Bost* (1980), 80 Ill. App. 3d 933, 952, 400 N.E.2d 734.) When such proof is offered through relatives, caution must be taken that there not be undue emphasis on the fact that the victim left a surviving family. (*Bost,* 80 Ill. App. 3d at 953.) However, the fact that the witness is a close relative who breaks down on the stand is not a basis for reversal. *Bost,* 80 Ill. App. 3d at 952.

■ In this case, Triplett's testimony was relevant to the State's case because he found the victim's body after she was murdered, and he testified as to the location and condition of the victim's body as well as the scene of the crime. Furthermore, the photographs he identified as accurately depicting the scene and the victim as he found

them on November 30, 1986, were also relevant as further evidence of the murder scene. Additionally, unlike the witness in *Bost*, Triplett did not break down on the stand but only made the initial comment "Oh my God" when he saw the first photograph.

■ Defendant's argument that he made a timely objection to showing the witness the photographs is also without merit. Defendant saw the photographs prior to trial and did not determine at that time how they would be introduced by the State. Defendant also did not object to the admission of the photographs at the trial but asked the judge to order the State to stipulate as to the content of the photographs rather than show the remaining ones to the witness. *People v. Starks* (1983), 116 Ill. App. 3d 384, 451 N.E.2d 1298, cited by defendant in support of his argument is factually distinguishable because, in that case, the family members' testimony was not relevant to the State's proof of its case.

For the aforementioned reasons, we conclude that no error was committed by allowing the life and death witness to identify photographs of the victim's body and scene of the crime.

■ Defendant next contends that the trial judge's hostility toward defense counsel prejudiced the jury against his case. In all criminal prosecutions, the accused person is entitled to a fair and impartial trial by a jury. (*People v. Velasco* (1989), 184 Ill. App. 3d 618, 640, 540 N.E.2d 521; *People v. Heidorn* (1983), 114 Ill. App. 3d 933, 936, 449 N.E.2d 568.) While the trial judge has wide discretion in the conduct of a trial, he must not interject opinions or comments reflecting prejudice against or favor toward any party. (*Velasco*, 184 Ill. App. 3d at 640; *Heidorn*, 114 Ill. App. 3d at 936.) This is particularly true in a jury trial, where jurors are watchful of the judge's conduct, and the court must exercise a high degree of care to avoid influencing the jury. *Velasco*, 184 Ill. App. 3d at 640; *People v. Sprinkle* (1963), 27 Ill. 2d 398, 403, 189 N.E.2d 295.

■■ Improper comments include those which reflect disbelief in the testimony of defense witnesses, confidence in the credibility of the prosecution witnesses or an assumption of defendant's guilt. In addition, a hostile attitude toward defense counsel or remarks that defense counsel has presented his case in an improper manner may also be prejudicial and erroneous. (*Heidorn*, 114 Ill. App. 3d at 937.) However, for comments by the trial judge to constitute reversible error, the defendant must show that the remarks were prejudicial and that he or she was harmed by them. (*Velasco*, 184 Ill. App. 3d at 640; *Heidorn*, 114 Ill. App. 3d at 937.) Where it appears that the comments do not constitute a material factor in the conviction, or that

prejudice to the defendant is not the probable result, the verdict will not be disturbed. (*People v. Parker* (1976), 40 Ill. App. 3d 597, 605, 352 N.E.2d 394.) Thus, remarks which are improper may also be harmless error. "[I]n each case an evaluation of the effect upon the jury of a trial court's interjections must be made in the light of the evidence, the context in which they were made and the circumstances surrounding the trial." *People v. DeBerry* (1966), 72 Ill. App. 2d 279, 285, 219 N.E.2d 701. See also *People v. Freeman* (1989), 182 Ill. App. 3d 731, 734, 538 N.E.2d 681; *People v. Wofford* (1987), 156 Ill. App. 3d 238, 243-44, 509 N.E.2d 1026.

■■■ In this case, defendant quotes two conversations in which the trial judge made improper comments to defense counsel in the presence of the jury. The first set of comments were made during defendant's cross-examination of defendant's girlfriend. Defense counsel was in the process of questioning the witness regarding when she had signed the consent to search form as follows:

"Q. So, they didn't ask you to sign this when they first got to your apartment, did they?

A. No.

Q. Before they came in and tore your apartment apart looking for things—"

At this point the State objected, but defense counsel continued questioning the witness as follows:

"Q. (Continuing)—they didn't didn't [*sic*] ask to [*sic*] you sign this consent to search form?"

The trial judge then proceeded to admonish defense counsel as follows:

"I asked you earlier, and I'm not asking you anymore, I'm telling you, when there's an objection, counsel, stop talking, you understand that?"

After making several comments to defense counsel outside the presence of the jury, the jury was returned to the courtroom and the trial judge addressed the jury as follows:

"Ladies and gentlemen, the objection of the last question is sustained.

The question was unprofessional in its character. I'm sure it was unintended by counsel. He has been admonished by the Court, and I'm sure that kind of thing will not happen again."

The other comments quoted by defendant were made during defense counsel's cross-examination of Sergeant Jones.

"Q. And per Judge Durkin's order you then went into the jury room and continued the conversation that you and I had started, is that not correct?

A. I don't know about the judge's order, but I was asked by State's Attorney Kopec to come here to have an interview with you.

Q. Mr. Kopec didn't tell you that the judge ordered that you come to—"

The trial judge then admonished defense counsel as follows:

"Ladies and gentlemen—counsel, that question is most unprofessional. I hereby admonish you and tell you to desist, to stop that area."

The trial judge then made several comments to the jury explaining the discovery process in a criminal case and then stated:

"The fact that I may have issued a discovery order prior to trial has nothing to do with your determination of the case, and it is unfair to have that.

I hereby instruct you to disregard any implication that is contained in that question.

Counsel, you are admonished to cease in that area."

We find in both conversations that it was improper for the trial judge to comment in the presence of the jury on defense counsel's unprofessional conduct, particularly where he had already admonished counsel on that very issue outside the presence of the jury. Nevertheless, we find the comments neither prejudicial nor a material factor in defendant's conviction in view of the strong evidence of defendant's guilt. As a result, the trial judge's comments did not constitute reversible error.

■ At the trial, Pamela Fish testified as an expert in the field of serology and electrophoresis. She stated that, "within a reasonable degree of scientific certainty," the blood sample from the floor of the victim's apartment was consistent with the sample from the knife found near her body, but that both samples were inconsistent with the sample taken from defendant or co-defendant. She further testified that she analyzed the blood from a stain found on the inside pocket lining of a pair of trousers belonging to defendant. Fish then stated that, "within a reasonable degree of scientific certainty," the blood found on the inside of defendant's trousers pocket was consistent with the blood found on the knife as well as the blood on the floor of the apartment. *Redmon v. Sooter* (1971), 1 Ill. App. 3d 406, 412, 274 N.E.2d 200, defines a reasonable degree of medical certainty as the "general consensus of recognized medical thought and opinion con-

cerning the probabilities of conditions." (See also *Mahr v. G.D. Searle & Co.* (1979), 72 Ill. App. 3d 540, 574, 390 N.E.2d 1214 (where the court stated that "an expert need not base an opinion upon absolute scientific certainty, but only upon a reasonable degree of scientific certainty").) Although Fish testified that she could not determine with a reasonable degree of scientific certainty that the victim's blood matched the blood found at the scene of the crime or on the knife, her testimony did establish that the blood found in the pocket of defendant's trousers matched the latter two samples.

■ In addition to Fish's testimony regarding the scientific evidence at the scene of crime, we have defendant's own admission that he was at the victim's apartment the day she was murdered. Defendant acknowledged that he knew the victim had been murdered but claimed that he did not report it to the police because there had been several Puerto Ricans at the scene with a shotgun, and they had threatened to shoot him if he told anyone what had happened. When a defendant elects to explain the circumstances of what has occurred, he is bound to tell a reasonable story or be judged by its improbabilities. (*People v. Lester* (1986), 145 Ill. App. 3d 720, 738, 495 N.E.2d 1278.) In this instance, defendant's explanation of what he found at the victim's apartment was not credible.

■■ There was also evidence of defendant's guilt presented through the testimony of several witnesses who were in the victim's apartment building on the night of the murder. Ms. Paul, the victim's neighbor, heard someone say "Frances" and "son." Defendant was Frances Williams' son. Frances Williams had worked with the victim, and defendant acknowledged that he had known the victim. Ms. Saunders, who lived on the floor below the victim's apartment, testified that a male rang her doorbell on the night of the incident and asked for "Zek," which was the victim's nickname. She also stated that about 30 minutes later she heard a "thud" from the victim's apartment which sounded like someone falling. Ms. Haynes testified that she was visiting Ms. Saunders on the night of the incident and that she saw two men in the hallway. One of the men was wearing a black jacket and cap. She stated that the cap identified as belonging to defendant looked like the one she saw on the night in question. Detective Karl testified that defendant referred to the victim as "Zekee" and admitted being in the victim's apartment during the time period when Saunders and Haynes stated that they heard a "thud" from the victim's apartment. Detective Pesavento testified that defendant's girlfriend identified clothes taken from her apartment as the clothes defendant was wearing on the night of the murder. This was the same

clothing which contained the bloodstain which was consistent with the blood taken from the knife and the crime scene. Sergeant Jones testified that when he spoke with defendant alone defendant made the statements, "I didn't mean to do it. She was like a mother to me." On cross-examination Jones acknowledged that he had prepared no police report which contained this statement by defendant but also testified that he had prepared no other reports regarding the case because he had not been assigned as one of the investigating officers.

We, therefore, conclude that in view of all of the aforementioned evidence of defendant's guilt, any impropriety in the trial judge's comments to defense counsel was not a material factor in defendant's conviction and that it was harmless error.

■■ Defendant cites three cases in support of his argument which are factually distinguishable from this case. In *People v. Marino* (1953), 414 Ill. 445, 111 N.E.2d 534, the trial judge made comments during the examination of a key witness by defense counsel which conveyed to the jury that the witness was not worthy of belief. The court also made hostile comments to defense counsel. The *Marino* court held that in view of the fact that the evidence was closely balanced, defendant had been prejudiced by the trial judge's improper conduct, and that it was reversible error. In *People v. Santucci* (1962), 24 Ill. 2d 93, 180 N.E.2d 491, defendant's guilt or innocence was dependent on which witness the jury believed. During the trial, the judge questioned each witness thereby emphasizing testimony which pointed to the guilt of the accused or discredited the accused's key witnesses. The trial court also displayed impatience or hostility toward defense counsel and the way he presented his case. In *People v. Mays* (1989), 188 Ill. App. 3d 974, 544 N.E.2d 1264, the trial judge sighed and threw down his pencil during defense counsel's cross-examination of a key witness which conveyed to the jury the court's sentiments regarding defendant's theory of his case. The trial court also prematurely limited defense counsel's closing argument. The trial judge's improper conduct in these cases was not limited to a negative reaction toward defense counsel. Rather, in each instance the trial judge also improperly invaded the fact-finding province of the jury in a manner that was prejudicial to defendant and potentially a material factor in his conviction. Because we have reached the opposite conclusion in the instant case, we do not find these cases controlling.

■■ ■ Defendant next contends that the rebuttal testimony of the fingerprint examiner was improper and prejudicial to him because it did not explain, repel, contradict or disprove evidence presented by

defendant, and it may have led the jury to believe that he misrepresented this evidence. Rebuttal evidence is that which is presented by the prosecution to explain, repel, contradict or disprove evidence presented by the accused. (*People v. Rios* (1986), 145 Ill. App. 3d 571, 584, 495 N.E.2d 1103.) The decision to permit rebuttal testimony rests largely in the discretion of the trial court (*People v. Andrews* (1988), 172 Ill. App. 3d 394, 399, 526 N.E.2d 628; *People v. Egan* (1978), 65 Ill. App. 3d 501, 511, 382 N.E.2d 477), and that decision will not be reversed on appeal unless the court has abused its discretion resulting in prejudice to the defendant (*Egan*, 65 Ill. App. 3d at 511; *People v. Thornton* (1977), 54 Ill. App. 3d 202, 207, 369 N.E.2d 358). Additionally, the fact that the rebuttal evidence could have been introduced by the State in its case in chief will not render the evidence inadmissible in rebuttal. *People v. Ross* (1981), 100 Ill. App. 3d 1093, 1096, 427 N.E.2d 868.

 In the State's case in chief, Dennis Keating, an evidence technician with the Chicago police department, presented testimony regarding various items of physical evidence at the scene such as the bloodstains and samples taken, whether there were signs of forced entry, the condition of the apartment, the knife found at the scene and the areas of the apartment from which he took palm and fingerprints. On cross-examination, Keating stated that it was the residue of oils or water from a person's hand which caused a fingerprint to form. On redirect, Keating testified that a person could touch an item and not leave any fingerprints depending on the surface touched, the amount of perspiration secreted, temperature and whether gloves were worn. During defendant's case, Officer Montalbano testified that there were no palm or fingerprints belonging to defendant among the prints that were found at the scene of the crime. Then in rebuttal, the State presented the testimony of Officer Thomas Gimley, who stated that the knife found at the scene had no fingerprints on it. Therefore, when Gimley testified in rebuttal that no prints were on the knife, the evidence that an item could be touched without the formation of any prints had already been presented. Montalbano had also confirmed Keating's previous testimony during cross-examination by the State. Because the knife had obviously been touched, Gimley's testimony was presented to contradict or repel the inference that the absence of defendant's prints meant he had not touched the knife. Thus, the rebuttal testimony was proper. Any argument that defendant did not open the door to this testimony is without merit where most of Keating's testimony regarding the fingerprints was elicited during cross-examination by defense counsel and Montalbano was called as a de-

724

fense witness. See *People v. Payne* (1983), 98 Ill. 2d 45, 49, 456 N.E.2d 44.

■■■ ■ Defendant contends that the State failed to prove him guilty of murder and robbery where there were no identification witnesses or physical evidence of defendant's presence at the scene of the crime, and there were no signed statements by defendant admitting his quilt. When an appeals court reviews the sufficiency of evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89.) Then, " '[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as the weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.*" (Emphasis in original.) (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, quoting *Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789.) Further, discrepancies in the testimony of witnesses go to the issue of credibility, which must be judged by the trier of fact. *People v. Thomas* (1981), 96 Ill. App. 3d 443, 450, 421 N.E.2d 357.

Because we have previously addressed this question as part of our discussion of whether the trial judge's improper comments were reversible error, we need not discuss it further. Pursuant to our former discussion, we conclude that the evidence was sufficient to establish defendant's guilt beyond a reasonable doubt.

■■ Defendant finally contends that his 40-year sentence for murder was excessive because he had no prior criminal background, or other violent behavior, had rehabilitative potential because of his young age and had showed his remorse for the victim's death. It is recognized that, in considering the propriety of punishment, a court of review must give great weight to the judgment of the trial court. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492, 431 N.E.2d 344; *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882; *People v. Bergman* (1984), 121 Ill. App. 3d 100, 108, 458 N.E.2d 1370.) The imposition of a sentence is a matter of judicial discretion and, absent an abuse of this discretion, the sentence of the trial court may not be altered upon review. Additionally, the trial judge is normally in a better position to determine the punishment to be imposed than is a court of

review. *Perruquet*, 68 Ill. 2d at 154; *People v. Butler* (1976), 64 Ill. 2d 485, 490, 356 N.E.2d 330.

■■ A reasoned judgment as to the proper sentence to be imposed must be based upon the particular facts and circumstances of each individual case. (*Perruquet*, 68 Ill. 2d at 154.) Such a judgment depends upon many factors, including the gravity of the offense and the circumstances of commission, the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, age, and criminal history. *Perruquet*, 68 Ill. 2d at 154.

■■ The sentencing judge is charged with the difficult task of fashioning a sentence which would strike the appropriate balance between protection of society and rehabilitation of the offender. (*People v. Cox* (1980), 82 Ill. 2d 268, 280, 412 N.E.2d 541; *Bergman*, 121 Ill. App. 3d at 109.) Yet, the objective of restoring the offender to useful citizenship is to be accorded no greater consideration than that which establishes the seriousness of the offense. (*People v. Waud* (1977), 69 Ill. 2d 588, 596, 373 N.E.2d 1; *Bergman*, 121 Ill. App. 3d at 109.) The trial court is not required to detail for the record the process by which it concluded that the penalty imposed was appropriate. *La Pointe*, 88 Ill. 2d at 493; *Bergman*, 121 Ill. App. 3d at 110.

■■ In this case, the court found that the murder was committed during the course of a forcible felony and that defendant was eligible for the death penalty. However, the court considered the absence of prior criminal activity as a mitigating factor which precluded the death penalty. The court also noted that defendant could also be sentenced to a life or an extended term of 80 years. However, the court did take into consideration defendant's age and potential for rehabilitation in sentencing him to a term of 40 years. Therefore, we conclude that the court did consider all of the relevant factors, and its sentencing determination was proper.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

JUSTICE LaPORTA, dissenting:

I cannot agree with the majority's conclusion that the trial court's improper comments to defense counsel were harmless error. Therefore, I respectfully dissent.

In my view, the trial court's treatment of defense counsel contaminated the entire proceeding to such a degree that defendant was deprived of his right to a fair trial. Illinois Supreme Court Rule 63 (107 Ill. 2d R. 63), incorporating Canon 3 of the Code of Judicial Conduct,

provides, *inter alia*, that a judge should maintain order and decorum in proceedings before him, should be patient, dignified, and courteous to litigants, jurors, witnesses, and lawyers, and should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law (107 Ill. 2d Rules 63(A)(2), (A)(3)). Thus, the primary objective of the trial judge is to conduct a fair and unbiased trial.

My reading of the record in this case indicates that throughout the trial, the court engaged in abusive and insulting behavior toward defense counsel, but did not display the same behavior toward the prosecutor. For example, the trial judge referred to defense counsel's conduct as "supercilious" and "unfair" and twice called him "unprofessional." The court chastised defense counsel for inappropriately arguing objections, but did not comment at all when the prosecutor argued an objection in a similar manner. The trial judge suggested during a side bar that defense counsel "[e]at some skin-toughening food over lunch." The judge criticized him for admonishing witnesses when defendant's attorney had done no such thing, and directed counsel not to make editorial comments when none had been made. Other remarks made by the court to defense counsel were sarcastic and clearly designed to denigrate and humiliate him.

Although some of the court's comments were made outside the presence of the jury, many of them were heard by the jury. Those remarks, which conveyed to the jury the judge's belief that defense counsel was attempting to present his case in an improper manner, could only have had the inevitable effect of prejudicing defendant in the eyes of the jury. (*People v. Finn* (1959), 17 Ill. 2d 614, 162 N.E.2d 354.) Jurors are very aware of the attitudes and opinions of the judge, and any disclosure of disbelief or hostility by the court is very likely to influence them in arriving at their verdict. (*People v. Santucci* (1962), 24 Ill. 2d 93, 180 N.E.2d 491.) Such conduct by a trial judge is prejudicial error. (*People v. Zaccagnini* (1963), 29 Ill. 2d 408, 194 N.E.2d 286.) The record indicates that defense counsel did nothing more than attempt to fulfill his duties as an advocate. Yet, the trial court criticized and ridiculed him, suggesting to the jury that defense counsel was attempting to present his case in an improper manner. Moreover, the court's treatment of defense counsel must have adversely affected his performance during the trial.

Defendant was convicted on circumstantial evidence which I do not find to be overwhelming, and the court's accusations of "unprofessional" or "unfair" conduct occurred while defense counsel was cross-examining the two most important witnesses. It is entirely pos-

sible that defendant is guilty of the crimes for which he was charged, but on this record, the jury did not have an opportunity to fairly evaluate the case against him and to determine his guilt or innocence based upon the evidence presented.

The trial court's comments interjected throughout the trial subjected defense counsel to repeated attacks on his ability to adequately and properly represent the defendant. It does not appear that the court's treatment of defense counsel was justified, and its continuation throughout the trial must have conveyed to the jury a hostile attitude toward the defense. (*Santucci*, 24 Ill. 2d 93, 180 N.E.2d 491.) The trial court's behavior would almost inevitably have prejudiced the defendant in the eyes of the jury. *Finn*, 17 Ill. 2d 614, 162 N.E.2d 354.

Certainly the defendant was entitled to a fair and unbiased trial to test his guilt or innocence, and I am convinced that he did not get one. In my view he is entitled to a new trial. I would, therefore, reverse defendant's convictions and remand for a new trial.

JUSTICE EGAN, specially concurring:

I concur in the opinion of Justice Rakowski that the judgment of conviction should be affirmed. I concur specially because I wish to make my position clear on certain arguments raised by the State and to explain why I must part company with Justice LaPorta in her view that a new trial is required.

I agree that the judge's comments in the presence of the jury were improper but did not constitute reversible error in view of the evidence. Fish testified that the blood found in the victim's apartment was "consistent" with samples of blood taken from the defendant's trousers. There was also blood spattered on other clothing of the defendant. The witnesses heard a sound like a body falling within 20 minutes or one-half hour after a man went up the stairs. The defendant's own statement identifies him as that man. The defendant told a preposterous story. In addition to the story's inherent incredibility, it is most unlikely that the alleged unidentified Puerto Ricans would have escaped the notice of the women who lived in the building and who saw the defendant and his companion. The State's case was not overwhelming, but it was strong enough to withstand the argument that any hostile attitude displayed by the judge toward the assistant public defender requires a new trial. I so conclude even if we were to disregard completely the testimony of Sergeant Jones that the defendant told him, "I didn't mean to do it. She was like a mother to me." It would unnecessarily prolong my opinion to explain why, but

suffice it to say that, in my judgment, Jones' testimony is susceptible to many arguments against its acceptance.

The defendant argues that the "judge's hostility toward defense counsel was apparent on several occasions" in and out of the presence of the jury. The State's response is that the "defendant's attorney invited the court's admonishments by his trial tactics" and that the defendant cannot be prejudiced by remarks made out of the presence of the jury. The State has referred us to specific parts of the record allegedly to show that the judge was repeatedly required to inject himself into the proceedings because the assistant public defender "persisted in interrupting and ignoring the court's suggestion." The State concludes that any "admonishment *** was well deserved since that conduct during trial was certainly not totally professional."

It is appropriate at this point to turn to the opinion of Justice Rakowski in which he says that it was "improper for the trial judge to comment in the presence of the jury on defense counsel's unprofessional conduct, particularly where he had already admonished counsel on that very issue outside the presence of the jury." (209 Ill. App. 3d at 720.) A reader might infer from that statement that the defense counsel's conduct was, in fact, unprofessional. I disagree with the State's contention and with any implication that the assistant public defender acted unprofessionally at any time. As I expect to show later, the instances called to our attention by the State buttress the position of the defendant and the observations made by Justice LaPorta in her dissent.

The defendant first refers us to what occurred out of the presence of the jury before the trial began when the judge expressed his displeasure over the filing of a large number of motions he considered untimely. He asked to see the public defender himself. It was during the colloquy at that time that the judge characterized the assistant public defender's statement as "supercilious" as noted in the dissent. The defendant next points to what transpired after the judge excused the jury and before he characterized the assistant public defender's conduct as "unprofessional" the first time. The following occurred in open court:

> "THE COURT: All right. Let the record reflect that the jury is out, witness is out. Mr. [Assistant Public Defender], for some reason you choose to engage in a line of cheap, histrionic questioning. Take a seat, Mr. [Assistant Public Defender]. When I need to hear from you I'll ask. Cheap, histrionic questioning that has absolutely nothing to do with this case, and in spite of the fact I continue to sustain objections along that line, you

continue the line of questioning. As I told you previously, when there is an objection, stop talking until I get a chance to rule on the objection.

[ASSISTANT PUBLIC DEFENDER]: May I make a comment?

THE COURT: No, you may not. Bring out the jury, please.

[ASSISTANT PUBLIC DEFENDER]: Will I have an opportunity to spread something of record?

THE COURT: You're spreading manure of record right now.

[ASSISTANT PUBLIC DEFENDER]: I'd like to spread something specific.

THE COURT: Shut up. Shut up. You'll be allowed to spread it of record later. Right now you shut up. Attempt to conduct yourself as a professional. I'm telling you right now, when there is an objection, stop talking."

I return to what precipitated that exchange. The following occurred in the presence of the jury:

"[ASSISTANT PUBLIC DEFENDER]: Before they came in and tore your apartment apart looking for things—

[ASSISTANT STATE'S ATTORNEY]: Objection.

[ASSISTANT PUBLIC DEFENDER]: (continuing)—they didn't didn't [sic] ask to [sic] you sign this consent to search form?"

Under no circumstances, in my judgment, may it be said that the assistant public defender was guilty of unprofessional conduct at that point nor does it necessarily show that he violated any rule of procedure. It is true that questions can be manifestly improper before they are completed, but it is also true that judges have sometimes ruled that an objection itself is premature before a question is completed. *If* the assistant public defender was guilty of a deviation from the rules, it was trivial. It certainly did not justify what followed. Who of us that has ever participated in strongly contested trials has not been guilty of the same trivial deviation? I know that I have in the heat of the fray; and I would have deeply resented to be damned as "unprofessional" by a judge in or out of the presence of the jury. I suspect that it was the judge's displeasure with the question itself that precipitated his censure of the assistant public defender. It was the question that the judge described as "unprofessional."

I turn now to the other instances in the record to which the State refers in support of its claim that the assistant public defender's conduct was unprofessional. When the assistant State's Attorney was

cross-examining, the following occurred:

"Q. Did you subsequently tell what you just told us to Chicago police detectives or Chicago—

[ASSISTANT PUBLIC DEFENDER]: Objection.

THE COURT: Grounds?

[ASSISTANT PUBLIC DEFENDER]: There has been no indication that this woman has ever told any other story. It's an attempt to introduce a prior consistent statement.

THE COURT: Overruled. Please just simply state your grounds, the evidentiary grounds. Don't argue the objection. Overruled."

The assistant public defender did nothing more than respond to the court's invitation, and his answer was a proper one.

When the assistant public defender was cross-examining a police witness the following occurred:

"[ASSISTANT PUBLIC DEFENDER]: Now perhaps, Detective, I was misleading, and I apologize to you and the ladies and gentlemen of the jury—

THE COURT: Counsel, when witnesses need to be admonished, it will be done by the court. You ask questions of the witness, he gives you answers. I am the judge, you are the lawyer. Ask questions.

[ASSISTANT PUBLIC DEFENDER]: Fine, Your Honor.

Q. Detective, in fact, there was a conversation had by either yourself or brother detectives in this case, with a woman by the name of Mary Scott, is that not correct?

[ASSISTANT STATE'S ATTORNEY]: Objection.

THE COURT: Grounds?

[ASSISTANT STATE'S ATTORNEY]: It doesn't go to impeachment. He didn't author this report.

[ASSISTANT PUBLIC DEFENDER]: I'm not offering it for the—

THE COURT: Another rule in this courtroom is that objections are not argued unless they are invited by the court. Objection overruled. You may answer that question."

The prefatory statement made by the assistant public defender before the judge injected himself could not be construed to be an admonishment of the witness nor any attempt on the part of the assistant public defender to usurp the function of the judge. Moreover, I note, as does the dissenting opinion, that the State's Attorney did, without chastisement, exactly what the assistant public defender had done and was criticized for.

Another instance called to our attention by the State occurred while the assistant public defender was again cross-examining a police witness:

> "[ASSISTANT PUBLIC DEFENDER]: Now, detective, you do recall that it was put into your police report that there were no signs of forced entry, is that correct?
>
> A. That's correct.
>
> [ASSISTANT STATE'S ATTORNEY]: Objection, asked and answered.
>
> THE COURT: Sustained.
>
> [ASSISTANT PUBLIC DEFENDER]: Do you recall—
>
> THE COURT: Counsel, counsel, counsel. Do you remember when you said you're talking too fast the officer should mention it? I'm going to mention it. When there is an objection, you stop until the court directs you to start again. You understand?
>
> [ASSISTANT PUBLIC DEFENDER]: Yes, sir."

That exchange does not show any improper conduct on the part of the assistant public defender. Moreover, I have never before heard of a rule that requires a questioner to stop asking questions after the judge rules on an objection until the judge directs him to start again.

In short, I repeat that those portions of the record called to our attention by the State do not support the State's contention that those instances justified the court's remarks later, which Justice Rakowski and I agree were improper.

As previously noted, the State argues that remarks out of the presence of the jury may not be considered by a reviewing court in determining whether prejudice occurred. I wish to make it clear that I do not subscribe to the view that, in determining whether the trial court has manifested a hostile attitude toward a defense lawyer, a reviewing court is restricted to what occurred only in the presence of the jury. I am aware that in *People v. Connor* (1988), 177 Ill. App. 3d 532, 532 N.E.2d 520, the court expressed the view that what occurred outside the presence of the jury did not prejudice the defendant. We do not know from the opinion what was said out of the presence of the jury; moreover, the appellate court held that the "two minor incidents [that occurred in the presence of the jury] can hardly have suggested to the jury that defense counsel attempted to present the case in an improper manner." (177 Ill. App. 3d at 539.) That is not true in this case. In *People v. Zaccagnini* (1963), 29 Ill. 2d 408, 194 N.E.2d 286, the court reversed a conviction saying this:

> "A reading of the record leaves no doubt that the trial judge

harbored feelings of hostility and prejudice against defendant *and his counsel.* We will not, except for two examples which occurred before the jury, detail the number of occasions during which these feelings were exhibited both within *and outside the presence of the jury.*" (Emphasis added.) 29 Ill. 2d at 409.

To me, therefore, the issue is reduced to this: Does the record show that the judge displayed such hostility toward the defendant's attorney in or out of the presence of the jury that the defendant's right to a fair trial was impaired? The dissent observes that "the court's treatment of defense counsel must have adversely affected his performance during the trial." (209 Ill. App. 3d at 726.) If I agreed with that observation of the dissent, I would vote to reverse the conviction. I do not agree; but I do recognize that things were said to the assistant public defender that should not have been said and that might have cowed some lawyers to the extent that effective representation might have been diminished. Lawyers, like judges, are not automatons.

This is not a petty theft case; this is a case of a brutal murder of a woman in her own home committed during the commission of a robbery. The assistant public defender was charged with the sleep-killing responsibility of defending a person the State wanted to execute. It is my judgment that, in the face of that responsibility, the assistant public defender never did anything but act with fortitude and respectful persistence under trying circumstances. Consequently, I do not believe that the assistant public defender's performance was affected. He continued throughout to represent his client ably and with vigor.

I do not agree with Justice Rakowski's description of Fish's testimony as establishing that the samples of blood taken from the defendant's trousers "matched" samples of blood taken from the victim's apartment. Fish testified that the electrophoresis test looks for nine specific enzymes in blood. She found that four (or perhaps five) of those enzymes were present in both the blood found at the scene and the blood on the defendant's pants. Fish was unable to determine whether the other five (or four) enzymes were present. Her findings of the presence of the enzymes were the basis of her ultimate conclusion that the blood samples were "consistent" with each other. Testimony that the samples were "consistent" is not the same as testimony that the samples "matched."

I concur with Justice Rakowski's opinion in all other respects.