**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 240359-U

Order filed February 17, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0359 Circuit No. 20-CF-806 |
| CORY T. WILLIAMS, | ) ) ) | Honorable William S. Dickenson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Presiding Justice Hettel and Justice Peterson concurred in the judgment.

_____

**ORDER**

¶ 1   *Held*: Defense counsel's decisions to (1) relinquish severance of defendant's charges and (2) refrain from moving to bar or object to improper testimony did not constitute ineffective assistance. Affirmed.

¶ 2   Defendant, Cory T. Williams, appeals his conviction for first degree murder, contending it should be reversed because his counsel provided ineffective assistance by failing to (1) sever his firearm possession and murder charges and (2) adequately challenge prejudicial life-and-death testimony presented by the State. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Defendant was charged by indictment with three counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)), being an armed habitual criminal (AHC) (*id.* § 24-1.7(a)(1), (3)), and unlawful possession of a weapon by a felon (UPWF) (*id.* § 24-1.1(a)). The charges were based on the allegation that defendant shot and killed Antonio Allen.

¶ 5        In April 2021, defense counsel filed a motion to sever the first degree murder charges from the AHC and UPWF charges. The State did not object and indicated it would elect to proceed first on the firearm possession charges. The court granted the motion and severed the charges. In November 2021, defense counsel withdrew the motion to sever, and the court vacated the prior order severing the charges. The matter proceeded to a jury trial in October 2022.

¶ 6        Immediately prior to trial, the State dismissed one count of first degree murder. Defense counsel declined to reinstate the motion to sever, explaining he had previously withdrawn the motion based on the State's decision to proceed first on the firearm possession charges and the strong possibility that defendant would testify.

¶ 7        At trial, Monique Thrope testified she had been in a relationship with both defendant and Allen intermittently for approximately 14 years. At the time of the incident, Thrope was living with defendant and her teenage son. On the morning of December 6, 2020, defendant returned home. He had left two days earlier to "cool off" after having an argument with Thrope. Upon his return, defendant discovered Allen inside the home. While Thrope and defendant were talking in the backyard, Allen began speaking to defendant through a window in a "mildly aggressive" tone and told him not to enter the house. Thrope was holding defendant by his hooded sweatshirt as Allen opened the back door, and Thrope fell as defendant pulled away from her to approach Allen. Thrope described Allen as being in "fight mode." Defendant and Allen began physically fighting

2

at the back door. Although Thrope did not see who threw the first punch, she indicated Allen was the aggressor. The altercation continued into the kitchen and ended once Thrope got in between defendant and Allen. Defendant told Allen more than once that he needed to leave. Defendant then exited the house through the back door and headed toward his vehicle. Thrope assumed defendant was leaving and exited through the front door to get into her vehicle to follow him. An officer responding to a domestic disturbance call from a neighbor arrived as Thrope was backing out of the driveway. As Thrope was explaining to the officer she was not in need of any assistance, Thrope's son came outside and stated Allen had been shot. Thrope entered the house and saw Allen walking toward the front door. Allen was bleeding from the mouth and attempted to talk but was unable to make any sound. Allen was transported by ambulance to the hospital, where he died.

¶ 8    Jerry Bradford testified he was defendant's next-door neighbor. On the day of the incident, he observed defendant banging on the back door of defendant's house and looking through the window yelling, "I'm gonna f*** you up, I'm gonna get even, you know what you did." After seeing defendant throw Thrope to the ground twice, Bradford instructed his fiancée to call the police. Bradford heard yelling once defendant entered the house and then observed defendant return to his vehicle in the backyard and lean over the front passenger seat. Defendant exited the vehicle with his hands in his pockets and attempted to reenter the house. Defendant could not get the door open, so he kicked it to gain entry. Bradford heard a gunshot and saw defendant leave the house and drive away in his vehicle. Bradford estimated defendant was inside the house for approximately two minutes. Another neighbor testified that after seeing defendant and Thrope arguing outside, he saw defendant grab something from his vehicle and walk back toward the house.

3

¶ 9    A dash camera video recording from a squad car captured defendant as he fled in his vehicle from an attempted traffic stop shortly after the shooting. Defendant drove to his parents' home and ran inside before officers forcibly entered and placed him under arrest. Defendant was transported to the police station, where he agreed to be interviewed. The interview was video recorded, and a redacted version of the recording was introduced at trial. In the interview, defendant stated he and Thrope had started arguing as he became suspicious when she would not let him inside the house. Defendant "snapped" when he realized Allen was inside after Allen appeared at the window and spoke to him. When defendant entered through the back door, Allen was standing in the kitchen wearing boxer shorts. Defendant and Allen began fighting after Allen threw his hands up. As both men punched each other, defendant was struck in the lip. After the fighting stopped, Allen went into the bedroom while defendant stood in the kitchen doorway. When Allen returned from the bedroom, defendant met him at the bedroom door and told him to leave. Allen lunged at defendant. Defendant pushed him away, pulled a gun from his waistband, and shot Allen. When asked why he felt he needed to use the gun to defend himself, defendant explained to detectives Allen was coming at him "in fight mode," and he did not have the energy to continue fighting with Allen. Defendant said he did not know where he shot Allen or if Allen had a weapon.

¶ 10    Defendant told detectives that after he shot Allen, he left the house and put the gun in his sister's mailbox. Defendant's sister retrieved the gun and placed it near the front door of her residence, where it was recovered by the police. Defendant's DNA was found on the gun. Firearm testing revealed the gun had fired the bullet that struck Allen.

¶ 11    As the State's life-and-death witness, Anna Thompson testified Allen lived with her, and she was pregnant with his child in December 2020. On December 5, 2020, Thompson and Allen had a disagreement and Allen left for the night. The next time Thompson saw Allen was at the

funeral home after his death. Thompson identified a photograph of Allen and stated he was a healthy individual. The State ended Thompson's direct testimony by asking the name and age of the child she shared with Allen. Thompson provided the child's first name and stated he was 17 months old. During cross-examination, defense counsel questioned Thompson about the fact that she was living with Allen at the time of his death and that he had left the day before the incident while she was pregnant with their son.

¶ 12    A forensic pathologist determined Allen's death was the result of a gunshot wound to the face. The pathologist noted the absence of soot or stippling indicated Allen had not been shot at close range, meaning the gun had been at least 18 to 24 inches away from Allen when fired.

¶ 13    Additional evidence introduced through police testimony included photographs depicting the broken doorjamb on the back door that defendant had allegedly kicked in when he reentered the house and images taken of defendant shortly after his arrest that showed injuries to his mouth. The State also presented two certified copies of defendant's prior felony convictions for armed robbery and unlawful delivery of a controlled substance. The court advised the jury the parties had stipulated that defendant's prior convictions were qualifying felonies. The specific offenses were not disclosed to the jury.

¶ 14    Defendant moved for a directed verdict, which the court denied. Defendant then informed the court he would testify and moved *in limine* to bar the State from using his prior conviction for unlawful delivery of a controlled substance for impeachment purposes. The court denied defendant's motion, and defendant ultimately elected not to testify.

¶ 15    During its rebuttal closing argument, the State noted Allen "won't be around anymore for his family, for his child." The State commented, "Allen would be there with his child later on in life" if defendant had gone out the back door and continued to leave after the initial altercation.

5

¶ 16    The jury was provided with instructions for the charged offenses in addition to instructions for self-defense and second degree murder. The jury found defendant guilty of first degree murder, being an AHC, and UPWF. The court sentenced defendant to a total of 75 years' imprisonment. Defendant's motion for a new trial was denied.

¶ 17    This appeal followed.

¶ 18                                II. ANALYSIS

¶ 19    On appeal, defendant first argues defense counsel's performance was deficient because counsel elected not to sever the firearm possession charges from the first degree murder charges. "[T]he proper standard for attorney performance is that of reasonably effective assistance." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under the two-pronged test set forth in *Strickland*, to prevail on an ineffective assistance claim a defendant must show (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced defendant, meaning absent the deficient performance, there is a reasonable probability the outcome of the proceeding would have been different. *People v. Jackson*, 2020 IL 124112, ¶ 90. Failure to establish either prong of this test is fatal to the claim. *Id.* We review *de novo* whether counsel's performance constitutes ineffective assistance. *People v. Yankaway*, 2025 IL 130207, ¶ 59.

¶ 20    To establish that counsel's performance was deficient, a defendant must overcome the strong presumption that the challenged action was the product of sound trial strategy. *Strickland*, 466 U.S. at 689. Counsel's judgment is afforded great deference, and the reasonableness of the contested conduct is evaluated from counsel's perspective considering the totality of the circumstances. *People v. Bell*, 2021 IL App (1st) 190366, ¶ 63. "Generally, a defense decision not

to seek a severance, although it may prove unwise in hindsight, is regarded as a matter of trial strategy." *People v. Poole*, 2012 IL App (4th) 101017, ¶ 10.

¶ 21    Here, the record reflects that defense counsel's decision not to pursue severance was a matter of trial strategy. Counsel initially moved to sever the AHC and UPWF charges to prevent the jury from learning defendant had prior felony convictions. Counsel later withdrew the motion due to the State's intention to proceed first on the firearm possession charges and his anticipation that defendant would testify at trial. Defendant concedes his prior convictions and his admission that he shot Allen foreclosed any possibility of acquittal on the AHC and UPWF counts. Convictions on those counts, if severed, could be offered by the State to impeach defendant's credibility when he testified at his subsequent murder trial. Thus, the jury may have been informed of defendant's felon status regardless of severance. Additionally, the trial court had already ruled on a motion *in limine* to allow evidence of defendant's prior felony conviction for unlawful delivery of a controlled substance. Under these circumstances, we cannot conclude it was objectively unreasonable for counsel to forgo severance as a strategic choice based on his expectation that defendant would testify, particularly when the validity of that expectation is demonstrated by defendant's assertion to the court that he would testify. See *People v. Gapski*, 283 Ill. App. 3d 937, 942-43 (1996) (failure to seek severance is a matter of trial strategy based on counsel's belief that defendant would testify and be subject to impeachment using prior convictions).

¶ 22    Defendant further contends counsel's performance was deficient for failing to bar Thompson as a life-and-death witness or object to her testimony regarding Allen's son. Defendant argues Thompson's statements regarding the child of the deceased victim were unfairly prejudicial and improperly influenced the jury. Strategic decisions, such as pretrial motion practice, are

7

immune from claims of ineffective assistance. *People v. Johnson*, 205 Ill. 2d 381, 407 (2002). Likewise, decisions regarding whether to lodge an objection are matters of trial strategy and are entitled to great deference. *Bell*, 2021 IL App (1st) 190366, ¶ 73.

¶ 23    Considering the State's entitlement to introduce full proof of a charged crime, which includes the right to present life-and-death witnesses, it is unlikely that any pretrial motion to exclude Thompson from testifying would have been successful. See *People v. Williams*, 209 Ill. App. 3d 709, 717 (1991); *People v. Holmes*, 397 Ill. App. 3d 737, 741 (2010) (failure to file a futile motion does not constitute deficient representation). Further, because it is not uncommon for murder victims to leave behind family members, not every mention of a deceased victim's surviving family automatically amounts to reversible error. *People v. Free*, 94 Ill. 2d 378, 414-15 (1983). "[I]n certain instances, dependent upon the factual circumstances, such evidence and argument can be harmless, particularly when the death penalty is not imposed." (Internal quotation marks omitted.) *People v. Bartall*, 98 Ill. 2d 294, 322 (1983). As Thompson's brief testimony regarding Allen's child was limited to his name and age, it did not dwell on the surviving family's existence to such an extent that the jury would have related that evidence to defendant's culpability. See *People v. Jones*, 2011 IL App (1st) 092529, ¶ 36 (testimony regarding the names and ages of deceased victim's children fell within the common-sense observation that the deceased left behind a family). Accordingly, as Thompson's testimony was admissible, it was not objectively unreasonable for counsel not to contest her testimony.

¶ 24    Moreover, defendant cannot establish prejudice by Thompson's testimony or the State's passing references to Allen's child in closing arguments, as neither contributed materially to defendant's conviction. See *id.* ¶ 42. At trial, the State introduced credible testimony from multiple witnesses that belied any claim of self-defense or second degree murder. After his initial

8

confrontation with Allen, defendant went outside to his vehicle. Despite having an opportunity to leave, defendant returned to the house, kicked in the door, and shot Allen, who was unarmed and in his underwear. The overwhelming evidence supporting the guilty verdict for first degree murder demonstrates that even if the jury were unaware of the existence of Allen's child, there is no reasonable probability the outcome would have been different. See *People v. Kitchen*, 159 Ill. 2d 1, 41 (1994). Consequently, defendant cannot prevail on his ineffective assistance claims.

¶ 25                                 III. CONCLUSION

¶ 26        For the reasons stated, we affirm the judgment of the circuit court of Kankakee County.

¶ 27        Affirmed.