THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MARCO NUNEZ, Defendant-Appellant.

First District (5th Division)   No. 82—1542

Opinion filed June 15, 1984.

Steven B. Muslin and Ira A. Moltz, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, James S. Veldman, and Thalia B. Photos, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2(a)) and sentenced to 14 years' imprisonment. He appeals and argues: (1) he was not proved guilty beyond a reasonable doubt; (2) the trial court erred in admitting collateral impeachment testimony; (3) the trial court erred in denying his post-trial motion based on new evidence; (4) the prosecutor injected improper comment; and (5) the trial court imposed an excessive sentence. We affirm.

At about 11 p.m. on May 1, 1981, Pedro Mendosa finished his shift as a restaurant cook and went to a nearby restaurant for coffee and conversation with friends. Mendosa left this restaurant at about 2 a.m., caught a bus, stopped at another restaurant for more coffee, and then left to go home. As he was walking, defendant approached from behind, then stood in front of him and asked for a cigarette. When Mendosa replied that he had none, defendant placed a knife on Mendosa's chest, demanded his money, and took Mendosa's knife and wallet.

Mendosa testified further that he had received his weekly wages that day, $240 consisting of one $100 bill, one $50 bill, eight tens, one five and five singles. In addition to the money, defendant took Mendosa's yellow knife, which Mendosa said he used to "open potatoes and onions." Defendant threatened to kill Mendosa if he said anything, then crossed the street to join a shorter man standing in front of a King Castle restaurant.

Mendosa immediately entered a restaurant where he saw Ronald Swick, whom he knew to be a police officer. After he explained what had happened, Mendosa and Swick went outside where, according to Mendosa, he pointed out defendant.

On cross-examination, Mendosa admitted that he did not remember the type of clothing that the robber wore, nor did he notice whether the robber had any scars on his face. He stated that the robbery took only about a minute and that he looked the robber up and down while the wallet and knife were extracted from his pockets. Mendosa lost sight of the robber when he went into the restaurant, but added that he and Swick "came out right away." After defendant was apprehended, Mendosa was taken to the police station but did not view defendant in a lineup.

Office Swick then testified to events leading up to defendant's arrest, substantially corroborating Mendosa's testimony. He said that while he was in a restaurant, Mendosa reported that he had just been robbed, and that the perpetrators were outside. Swick followed Mendosa outside, where Mendosa pointed to two men across the street and said they had robbed him. Mendosa also specified defendant as the one who had threatened him and taken his money. Swick recalled that defendant was approximately seven inches taller than the other man. Swick entered the restaurant, called the police and then joined Mendosa outside.

When Swick and Mendosa approached the two men, they walked away rapidly, then broke into a run. Swick pursued them into a parking lot and saw them attempt to jump over a fence; defendant's attempt was unsuccessful. Defendant then turned to exit the lot in Swick's direction. Swick identified himself as a police officer and told defendant that he was under arrest. Defendant said that he did not believe Swick, and continued his approach with a pocket knife in his right hand. Swick further testified that he disarmed defendant and took a yellow knife from him. At the police station, Swick recovered $240 from defendant's pocket in the same denominations as Mendosa had testified were stolen from him.

Louis Rodriguez testified on behalf of the defendant and stated that on the night of the incident, from about 9 p.m. until after midnight, he was at defendant's apartment with defendant and his family. Shortly after midnight, Rodriguez accompanied defendant and two other friends to a poolroom. About half an hour later, Rodriguez and defendant left to continue drinking at a bar. Rodriguez ordered beer there while defendant went next door to King Castle for food. Rodriguez stated that he remained in the bar until 2 a.m., and did not learn

that defendant had been arrested until the next day.

Defendant testified to the same events as Rodriguez and added that after he placed his order at King Castle, he went to the washroom and found that it was out of order. He went outside to a parking lot to relieve himself and while there, he saw two people running toward a nearby fence. As he walked away, a person wearing street clothes grabbed his arm and put a gun to his head. According to defendant, this person never identified himself as a police officer.

Defendant further testified that he was employed at the Brach Candy Company and that he had close to $300 that night because he had received his paycheck and because rent and utility bills were due. On cross-examination he said that he received and cashed his paycheck of about $250 on the day of the incident, and took all of his money, about $300, with him that night. He also said that he pulled his knife out of his pocket because Swick had a gun.

The parties stipulated that if called to testify, the court reporter would say that Mendosa's preliminary hearing testimony recounted that the assailant wore a hat and a turned-up jacket, although at trial Mendosa could not recall how his assailant was dressed. The State recalled Swick who stated that the $240 had been inventoried.

Over defendant's objection, the State called Robert Malone, payroll manager at Brach's, in rebuttal. Malone testified that defendant worked for the company on April 29 and 30, 1981, and that defendant was paid for those two days on Friday, May 8, in accordance with payroll procedure. The State then rested its case. Following deliberations, the jury returned a verdict of guilty.

Defendant presented a post-trial motion for a new trial based on newly discovered evidence. The new evidence showed that defendant had been working for Oakwood Cemetery and was paid $96.67 on April 23 and $39.21 on April 30. The State argued that the cemetery had indicated defendant was paid for the week of April 30, but after May 1, the date of the incident. The trial court denied defendant's motion. This appeal followed.

OPINION

■ Defendant first contends that he was not proved guilty beyond a reasonable doubt. He argues that Mendosa's identification was conflicting and uncertain, and therefore insufficient to support defendant's conviction. He posits that Mendosa pointed out the first person he saw after he found Swick, and that person happened to be defendant.

A reviewing court will not substitute its judgment for that of the

trier of fact in matters of weight, credibility, or conflicting evidence, and will not reverse a conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) The testimony of one identification witness is sufficient to sustain a conviction, even though contradicted by defendant, provided the witness is credible and viewed the defendant in circumstances permitting a positive identification. (*People v. Stringer* (1972), 52 Ill. 2d 564, 569, 289 N.E.2d 631.) The reliability of an identification is tested by the totality of the circumstances, including the witness' opportunity to view the perpetrator, degree of attention, accuracy of description, certainty and time elapsed between commission of the crime and identification. *People v. Manion* (1977), 67 Ill. 2d 564, 571, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.

In this case, the totality of circumstances supports Mendosa's identification of defendant. Mendosa focused his attention on the perpetrator from the time he was asked for a cigarette until he entered the restaurant to get Swick. For about one minute of this time, the perpetrator was less than an arm's length from Mendosa, and Mendosa viewed the perpetrator almost continuously from the commission of the crime to defendant's arrest and positive identification, a duration of minutes. Although a question arose concerning the consistency of Mendosa's description as between the preliminary hearing and the trial, it is the province of the trier of fact to reconcile such inconsistencies. See *People v. Johnson* (1979), 74 Ill. App. 3d 1037, 1048, 393 N.E.2d 40.

Moreover, defendant's theory collapses upon itself. The perpetrator was out of Mendosa's sight only twice: when Mendosa entered the restaurant to get Swick, and when Swick chased the suspect into the parking lot. Even so, Swick viewed the suspect throughout the chase. Defendant maintains that when Mendosa exited the restaurant, he pointed out the first person he saw, defendant. Of course, defendant's own testimony places him at the terminal point of the chase, the parking lot, and not at the point of origin, in front of the King Castle.

In our opinion, the jury was justified in relying upon Mendosa's identification, if in fact they did. We note that the yellow knife and currency recovered from defendant were powerful indications of guilt. Adding defendant's thoroughly impeached explanations, we are convinced that defendant was proved guilty beyond any reasonable doubt.

■ Defendant next contends that the trial court erred in permitting Robert Malone to testify, because the testimony was collateral

and immaterial. Malone testified that defendant did not receive a paycheck from Brach Candy Company on May 1 as defendant claimed, but was paid on May 8, a week after the robbery.

Our supreme court addressed similar contentions in *People v. Dennis* (1970), 47 Ill. 2d 120, 265 N.E.2d 385, *cert. denied* (1971), 403 U.S. 907, 29 L. Ed. 2d 683, 91 S. Ct. 2212. Noting that defendant had raised the issue of his whereabouts on the night of the crime by testifying that he attended the theatre with his girl friend, the court ruled that no error was committed in allowing the State to establish an inconsistent alibi. (47 Ill. 2d 120, 131-33.) As in *Dennis*, defendant here raised a crucial issue which the State was entitled to rebut. Defendant testified that he worked for Brach, received a $250 paycheck on May 1, cashed the check at a certain facility, and held the cash in anticipation of paying his rent and utilities. If the jury believed that defendant came into possession of the money this way, it would not believe that the money was robbed from Mendosa by defendant. In our judgment, Malone's testimony did not relate to a collateral issue; indeed, it went to the heart of defendant's credibility concerning the source of the money. The trial court properly permitted the testimony.

■ Defendant next contends that his motion for a new trial based on newly discovered evidence was improperly denied. He maintains that the proferred evidence of his employment at the Oakwood Cemetery would successfully refute the State's theory concerning the money in defendant's possession at the time of arrest. This contention must also fail.

The standard of review for such a motion is as clear as it is longstanding. Denial of the motion will not be disturbed on review absent an abuse of discretion. The burden is on the applicant to rebut the presumption that the verdict is correct, and to show that the evidence is of a conclusive character and that it could not have been discovered prior to trial in the exercise of due diligence. The closest scrutiny of the application is warranted in order to prevent the fraud and imposition which defeated parties might be tempted to practice. See *People v. Miller* (1980), 79 Ill. 2d 454, 464-65, 404 N.E.2d 199, and cases cited therein.

The trial court could reasonably conclude that defendant's "newly discovered" evidence could have been discovered prior to trial in the exercise of due diligence. Defendant's explanation, that the mistake was "understandable" given his movement from one job to the other, suggests that defendant *did* know of this evidence prior to trial, and either forgot who he worked for, or failed to obtain accurate informa-

tion concerning his employment. This court has held that the failure to exercise due diligence in discovering evidence prior to trial is sufficient alone to deny a motion for a new trial without reaching the issue of whether the evidence proposed would have properly warranted the granting of a new trial. *People v. Son* (1982), 111 Ill. App. 3d 273, 283, 443 N.E.2d 1115.

Moreover, as the State pointed out, even if this evidence was admitted it would not have changed the trial result. Not only does the total amount paid by Oakwood, $135.77, fail to explain the source of $240, but an employee at the cemetery disclosed that by the time of the incident, defendant had only been paid $96.56 and that a week *after* the incident defendant received $39.21. Under these circumstances, we find that the trial court properly denied defendant's motion because the newly discovered evidence was not of such a conclusive character that it would have changed the result on retrial and because this evidence could have been discovered prior to trial by the exercise of due diligence.

■ Defendant next asserts that he was fatally prejudiced by the prosecutor's redirect examination of Mendosa, which colloquy in pertinent part, was as follows:

"Q. Sir, Mr. Nolan [defense counsel] asked you *if you were scared today because defendant threatened to kill you?*

Mr. Nolan: Objection.

The Court: Sustained, leading.

Q. Why are you scared, sir?

A. Because, I don't know, I never been in these things, this is the first time.

Q. Thank you, no further questions, your Honor." (Emphasis added.)

In our opinion, although the prosecutor's question to Mendosa as to whether he was "scared because defendant threatened to kill you" was improper, it did not constitute reversible error. First, we note that during direct examination of Mendosa, the State queried as follows:

"Q. After he [defendant] took these things from you, did he say anything to you?

A. Yes.

Q. What did he say to you?

A. That if I said anything, he was going to kill me."

Then, during cross-examination, defense counsel asked that the court interpreter present the following question to Mendosa:

"Q. Ask him whether he testified before Judge Moran if he

recalls being asked the question, was the man who robbed him on the street, was he wearing a jacket turned up like this?

\* \* \*

[Mendosa]: I don't remember, I don't—I didn't know what I was saying, I was too nervous.

[Defense Counsel]: Ask him if he is nervous today?

A. Yes, very much."

The record further shows that on at least two additional occasions Mendosa testified under cross-examination that at the time of the incident he was nervous. In view of all of the above testimony, the prosecutor's comment could not have changed the result which the jury reached. No further reference to Mendosa's "nervousness" was made, and the trial court promptly sustained defendant's objection. We believe that any prejudice which resulted from the contested colloquy was thereby sufficiently cured. *People v. Carlson* (1980), 79 Ill. 2d 564, 577, 404 N.E.2d 233.

■ Defendant further assigns error to the prosecutor's comment during closing argument where he characterized defendant's defense as "that bunch of garbage" and queried as to why defendant's friends "wouldn't \* \* \* come in here [to testify]."

Initially, we do not believe that the prosecutor's reference to "that garbage" was equivalent to calling defendant and his legal counsel a liar, as defendant contends. Defendant's cited cases on this issue are clearly distinguished by the qualitative difference between the remarks of the prosecutor in the pending case and those in the cases defendant brings to our attention. In *People v. Williams* (1981), 99 Ill. App. 3d 919, 425 N.E.2d 1321, the defendant was characterized as a liar, rapist and pervert, and in *People v. Broadnax* (1975), 26 Ill. App. 3d 67, 325 N.E.2d 23, the defendant was called a liar several times during closing argument. We believe that the language in these cases is not comparable to the challenged statement before us.

■ Concerning defendant's assertion that the prosecutor unfairly commented on defendant's failure to produce certain witnesses, although this comment was improper, in view of the clear evidence establishing defendant's guilt—the testimony of the victim, Mendosa, who saw defendant face to face and who pointed defendant out to Swick shortly after the incident, the physical evidence and the fact that Mendosa again identified defendant immediately after defendant was apprehended—we cannot say that the remark prejudiced defendant to the extent that it constituted a material factor in his conviction. (*People v. Dowd* (1981), 101 Ill. App. 3d 830, 848-49, 428 N.E.2d 894.) We further note that the trial court promptly sustained defend-

ant's objection to this comment and instructed the jury to disregard the argument. For these reasons, we feel that the court's response was sufficient to cure any prejudice and therefore reject defendant's contention on this issue. See *People v. Baptist* (1979), 76 Ill. 2d 19, 28, 30, 389 N.E.2d 1200.

■ As a final matter, defendant challenges his sentence of 14 years which he contends was improperly imposed because it bears no relation to the facts of the incident or defendant's background. Defendant asks that his sentence be reduced to the statutory minimum for armed robbery, a Class X felony, which is punishable by imprisonment for a period between six and 30 years. Ill. Rev. Stat. 1981, ch. 38, pars. 18—2(b), 1005—8—1(3).

The record shows that at the hearing in aggravation and mitigation, police officers who had dealt with defendant on prior occasions testified for the State. Defendant's wife and mother provided testimony in mitigation. In rendering its sentence, the trial court considered the following evidence to be persuasive: "the testimony of the case" indicated that defendant approached Swick with a knife; approximately three months after the instant crime, in August, 1981, while defendant was out on bail, defendant tore a police officer's badge off his shirt during a struggle and was found to be carrying a long knife in a sheath; after he was arrested for that offense he struggled with the police and kicked an officer on the shin with his heel; and approximately a year prior to the pending case defendant was found guilty of aggravated assault.

The court further observed that on a separate occasion in August of 1981 defendant was arrested for unlawful use of a weapon and was seen throwing an object under a car which turned out to be a gun holster. A gun was later discovered under the front seat of the car. The court concluded that defendant was a serious threat to the public in view of the fact that he had "a previous history of weapons violence" and added that it would not consider defendant as a first offender because of his previous misdemeanor convictions.

Based on the foregoing evidence, which, as the trial court properly observed, suggests that defendant had a pattern of carrying dangerous weapons and using them during the commission of a crime, we cannot say that the court abused its discretion in sentencing defendant to 14 years' imprisonment. We further observe that in reaching its decision the trial court properly considered pending criminal charges against defendant (see *People v. La Pointe* (1982), 88 Ill.2d 482, 431 N.E.2d 344; *People v. Siefke* (1981), 97 Ill. App. 3d 14, 16, 421 N.E.2d 1071); and defendant's contention that he is entitled to a minimum

sentence because Mendosa was unharmed is without merit. See *People v. Ivery* (1979), 72 Ill. App. 3d 158, 162, 390 N.E.2d 608 (where we stated that the victim's submission to defendant's demands without a struggle "in no way exonerates defendant of the seriousness of the offense").

The facts as shown in the record are clearly sufficient to distinguish this case from those cases defendant cites wherein criminal sentences for armed robbery were reduced on appeal. In *People v. Dandridge* (1973), 9 Ill. App. 3d 174, 292 N.E.2d 51, defendant had a previous theft conviction, had violated his parole for that sentence, and escaped from jail while being held on the pending armed robbery charge. The appellate court reduced the lower limit of defendant's sentence from 14 years to 10 years "as a tolerable response to the aggravating circumstances" to allow defendant the chance of rehabilitation; the court affirmed the 28-year maximum. In the pending case, however, as the trial court observed, defendant demonstrated a pattern of armed violence, had two criminal convictions and had assaulted a police office while out on bond. In *People v. Harris* (1971), 1 Ill. App. 3d 22, 272 N.E.2d 403, the trial record was devoid of a motion for probation, presentence investigation or evidence in aggravation and mitigation. Also, in that case the State presented no evidence that the defendant had a prior criminal record. And, in *People v. Brown* (1971), 132 Ill. App. 2d 302, 270 N.E.2d 501, the sentences were reduced because the defendants did not have any prior criminal record. As previously stated, these facts clearly distinguish those cases from the circumstances before us.

For the foregoing reasons, and because the trial court had the unique opportunity to consider these factors, including defendant's demeanor, habits and prior criminal record (*People v. Cozzi* (1981), 93 Ill. App. 3d 94, 100, 416 N.E.2d 1192), the trial court's judgment is affirmed.

Affirmed.

MEJDA, P.J., and SULLIVAN, J.,* concur.

---

*Justice Kenneth E. Wilson heard the oral argument in this case. Following his death, Justice John J. Sullivan was substituted, listened to the tapes of the oral argument, and read the briefs and record.