THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM HALLOM, Defendant-Appellant.

First District (2nd Division)    No. 1—92—1261

Opinion filed August 9, 1994.

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Susan R. Schierl, and Laura Bertucci, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE DiVITO delivered the opinion of the court: Following a jury trial, defendant William Hallom was found guilty of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1 (now 720 ILCS 5/9—1 (West 1992))) and sentenced to 30 years in the custody of the Department of Corrections. On appeal, defendant contends that (1) the circuit court erred when it shuffled the juror cards prior to calling the prospective jurors for *voir dire* in violation of local court rule; (2) the State improperly bolstered the credibility of one of its witnesses; and (3) the court erroneously denied his section 2—1401 (Ill. Rev. Stat. 1991, ch. 110, par. 2—1401 (now 735 ILCS 5/2—1401 (West 1992))) motion for a new trial based on newly discovered evidence without first conducting an evidentiary hearing.

At trial, the following evidence was presented. Debra Robinson testified that on March 20, 1990, she left her home at 1732 West 14th Place in Chicago at about 4:45 a.m. to go to work as an elections judge. As she was walking through an empty lot at 1733 West 14th Street, she saw a person lying on the ground moaning faintly. She then ran to her mother-in-law's house at 1725 West 14th Street and called the police.

Chicago police officer Terrence Clark testified that he and his partner responded to a call of a "man down in [a] vacant lot" and, upon arriving at the scene, found a man lying in the grass. The man was moaning, bleeding from his face and head, and a broken brick, stained with blood, was resting on his lap. The man did not respond to their questions. After an ambulance took the man to the hospital, Clark first cordoned off the crime scene so it could be processed and then began to canvass the area looking for witnesses. He spoke with Charles Hopkins, who lived in a second-floor apartment across the street from the vacant lot. He then went to the hospital in hopes of learning the man's identity, but was unable to do so.

Dr. Shaku Teas of the Cook County medical examiner's office testified that she performed an autopsy on the unidentified man. During the external examination, she found multiple abrasions and lacerations to his head and face which were caused by a blunt object such as a brick. The man also sustained several "incised wounds," or superficial wounds caused by a sharp instrument, which could have

been a screwdriver. She also found bruises on the man's hands and fingers which could have resulted from an attempt to ward off an assailant. Her internal examination revealed a large hemorrhage under the scalp as well as swelling and injury to the brain. In her opinion, the causes of death were the cerebral injuries which resulted from a beating or assault and the multiple incised wounds.

James Earl Roberts testified that the decedent was his nephew, Terry Roberts, and that he last saw him alive on March 19, 1990. Neither he nor anyone in his family saw Terry again until he read the obituary section in the newspaper in early April 1990. The newspaper was soliciting information about the identity of an unidentified black male, and included both a physical and clothing description. Roberts realized that the unidentified black male was his nephew because the clothing description matched what Terry was wearing when he last saw him, and because the description stated that the person had a tattoo of a scorpion on the shoulder. He called the police and then went to the morgue to identify the body. At that time, he identified the decedent as his nephew, Terry Roberts.

Charles Robert Hopkins III testified that between 3 and 4 a.m. on March 20, 1994, he was in his apartment at 1742 West 14th Street watching television with his one-month-old daughter when he heard some noises coming from outside. He stood up, looked out the front window, and saw two men arguing in the vacant lot across the street and a third man standing on the street. After watching the persons argue for 10 to 20 minutes, he resumed watching television but was still able to hear them through the window. Approximately 20 minutes later, the arguing stopped. He did not look out the window again that night and fell asleep watching television.

The following morning, he awoke when a police officer knocked on his door. After speaking to the officer, he went to the lot across the street and saw bloodstains in approximately the same spot he had seen the men arguing.

On April 23, 1990, he went to the police station and viewed a lineup, where he identified defendant as one of the men he had seen arguing. He stated that he and defendant had gone to the same grammar school and that he had seen defendant around the neighborhood, but did not know his name. He also identified a black, snakeskin cap as the hat that defendant was wearing on March 20, 1990, and a photograph of Joseph Simpson as the third person he saw standing on the street.

On cross-examination, Hopkins stated that he did not see anyone fighting or anyone get injured.

Officer Harold Fujara, an evidence technician with the Chicago

police department, testified that he and his partner recovered a broken brick covered in blood, a screwdriver, a glove, and a set of keys in the vacant lot.

Joseph Simpson, defendant's cousin, testified that he had pleaded guilty to three charges of possession of a controlled substance and received three one-year terms of imprisonment. On March 20, 1990, at about 4 a.m., he was standing on the porch of a friend's house at 14th Street and Paulina Avenue when he heard two people arguing across the street in the vacant lot. He then walked across the street, and as he stood at the sidewalk, he saw defendant pick up a brick and hit Terry Roberts in the face. After Roberts fell to the ground, defendant hit him three additional times. When Simpson told defendant to leave Roberts alone, defendant told him to "get the fuck out of there." Simpson left and went to his cousin Sidney Plummer's house at 1419 South Ashland Avenue.

The next day, defendant came to Plummer's house and told Simpson that he "took that mark out." Simpson explained that defendant, who was holding a nine-mm pistol, meant that he had killed Roberts and threatened to do the same to him if he told anyone. Later that day, however, Simpson saw defendant's brother J.P. Hallom and told him what defendant had done. When defendant learned that he had told his brother, defendant told him that he "shouldn't have said nothing" and hit him in the face.

On April 20, 1990, Simpson went to the police station and was interviewed but was reluctant to tell the detective what he had seen because he was afraid of defendant. He did, however, tell the detective what he had witnessed, and, on May 2, 1990, he testified before a grand jury about the incident.

On August 10, 1991, two days before defendant's trial was scheduled to begin, Simpson was leaving his girl friend's house at 13th and Loomis at about 9 a.m., when defendant's friend Melvin "jumped" out of a car, stuck a gun in his side, and told him to get in the car where J.P. Hallom was waiting. After he got in the car, they drove to defendant's counsel's office at 180 North La Salle. During the ride, he was told that he had to change his story and was instructed to say that the police had held a gun to his head.

Upon arriving at the office building, Simpson and J.P. went to the attorney's office where he told the attorney that defendant did not kill Roberts and that he said that to the police only because they put a gun to his head and threatened to charge him with the murder. At trial, Simpson explained that he said this to the attorney because he was afraid Melvin and J.P. would shoot him.

On cross-examination, Simpson stated that he spoke on the phone

with defendant's attorney on August 8 and 9 and that no one held a gun to him at that time. He admitted that he was locked up for an outstanding parole violation when he went to the police station on April 20, 1990, but stated that the police did not indicate that they would do anything for him if he gave them a statement and did not remember telling defendant's attorney that the police had promised to help him in court. He also admitted telling the attorney that when he spoke with the police he knew nothing about the incident, that one of the officers wrote the statement with one hand while holding a gun to his head with the other, and that defendant never told him that he "took the mark out," but explained that these statements were false because he was scared and nervous.

On redirect examination, Simpson testified that on August 5, 1990, he spoke with an assistant State's Attorney about being relocated and decided against it. Following the incident on August 10, 1990, however, he stayed at a motel with a deputy sheriff.

Chicago police detective Patrick Foley testified that on August 12, 1990, he spoke with Simpson, and subsequent to that conversation, he lodged charges against and obtained an arrest warrant for J.P. Hallom. At the time of trial, the warrant was still outstanding. The State then rested.

Defendant testified in his own behalf that he was acquainted with Roberts and that Roberts and Simpson would chase after trucks and try and break into them. On the morning of March 20, 1990, his aunt told him about a murder in the vacant lot, and later that afternoon, while standing outside Sidney Plummer's house, he saw Simpson with scratches on his face. He denied threatening Simpson with a gun or punching him in the face. He further stated that Simpson was not in his group of friends, but rather would "hang out" with his brother, J.P. Hallom. He also stated that he had known Hopkins since grammar school. Finally, he stated that Plummer gave him the snakeskin cap around April 9, 1990.

As previously indicated, the jury found defendant guilty of first degree murder, and after denying defendant's post-trial motion and section 2—1401 motion based on newly discovered evidence, the circuit court sentenced him to 30 years' imprisonment. This appeal followed.

Defendant first contends that the circuit court committed reversible error when, in violation of Cook County Circuit Court Rule 5.3, it shuffled the jury cards prior to calling the prospective jurors in the jury box for *voir dire*. In response, the State asserts that defendant has waived consideration of this issue on appeal by failing to make an objection until after jury selection was completed. The State also

argues that even if the issue has been properly preserved, no reversible error occurred because the *voir dire* process was conducted in a fair and appropriate manner.

The day after the jury was selected, defense counsel informed the court that the prospective jurors were called into the jury box randomly in violation of Circuit Court Rule 5.3. Rule 5.3(a) provides that "[p]rospective jurors who are assembled in a central jury room shall be called into the jury box in the order in which they were drawn from the jury assembly room." (Cook County Cir. Ct. R. 5.3(a).) The court acknowledged the rule, but stated that it was "standard practice" to "shuffle" the cards because they come from another building and it was not known if the order of the cards was in fact the order in which the jurors were called in the jury room.

●1 We hold that defendant has waived consideration of this issue by failing to make a timely objection to the court's shuffling of the jury cards. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274 (stating that both a contemporaneous objection and a written post-trial motion are necessary to preserve issues for appellate review).) *Voir dire* was completed on August 13, 1991, but no objection to the process was made until the following day. Thus, because defendant failed to inform the court of its error until it was too late to correct it, we find that defendant has waived the issue for purposes of appeal.

Moreover, even if the issue were properly before us, defendant's arguments would be unavailing. Although local court rules have the force and effect of statutes and should be obeyed (see *Martin Brothers Implement Co. v. Diepholz* (1982), 109 Ill. App. 3d 283, 286, 440 N.E.2d 320), the circuit court's failure to follow the dictates of Rule 5.3 does not automatically invalidate defendant's conviction. Rather, the law is well settled that a conviction will be affirmed on appeal despite the existence of errors not reaching constitutional dimension unless the defendant can prove that the errors affected the result and denied him a fair trial. (*People v. Scarpelli* (1980), 82 Ill. App. 3d 689, 697, 402 N.E.2d 915, *cert. denied* (1981), 450 U.S. 915, 67 L. Ed. 2d 340, 101 S. Ct. 1357; *People v. Legel* (1974), 24 Ill. App. 3d 554, 559, 321 N.E.2d 164.) In contrast, constitutional errors will require reversal unless the State demonstrates that the error was harmless beyond a reasonable doubt. (*People v. Howard* (1991), 147 Ill. 2d 103, 147-48, 588 N.E.2d 1044, *cert. denied* (1992), 506 U.S. 875, 121 L. Ed. 2d 154, 113 S. Ct. 215, citing *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) Because the sixth amendment simply requires that juries be drawn from a "fair cross section" of the

community (*Taylor v. Louisiana* (1975), 419 U.S. 522, 526, 42 L. Ed. 2d 690, 695-96, 95 S. Ct. 692, 695-96), and because defendant makes no allegations that the venire did not constitute such a fair cross-section, we cannot conclude that the error reached constitutional dimension. Thus, defendant bears the burden of showing how he was prejudiced by the circuit court's actions.

We believe that defendant is unable to make such a showing. As defendant himself argues, Rule 5.3 was intended to guard against jury tampering and other unfairness. By shuffling the jury cards and calling the jurors in a random order, the court was able to promote these goals because it was unknown whether the cards had been tampered with prior to their arrival. Accordingly, we find that no reversible error occurred.

Defendant next contends that the State improperly bolstered Simpson's credibility when it elicited testimony from Detective Foley that charges had been lodged against his brother J.P. Hallom in connection with Simpson's earlier recantation of his statement to the police. The State responds that defendant has waived review of this issue by failing to include it in his post-trial motion. In the alternative, the State maintains that the detective's testimony was properly used to rehabilitate Simpson following his impeachment with the prior inconsistent statements to defendant's attorney. Finally, the State argues that any error in Foley's testimony was merely harmless.

At trial, defendant impeached Simpson's testimony by eliciting on cross-examination that he had previously made statements to defense counsel inconsistent with his trial testimony and that his earlier statement to the police that defendant committed the offense was the result of coercion. Thereafter, the circuit court specifically stated that because Simpson's credibility had been put in issue by defendant, the State had a "right" to try and rehabilitate him. The State, in an attempt to reestablish Simpson's credibility, elicited testimony from Detective Foley that charges were filed against J.P. Hallom for the events occurring on August 10, 1990, and that a warrant for his arrest was outstanding.

•2 Initially, we hold that defendant has waived this issue for purposes of appellate review. Although he objected to Foley's testimony at trial, he failed to include the issue in his post-trial motion. Because a written post-trial motion is a necessary prerequisite to preserve issues for appeal (*Enoch*, 122 Ill. 2d at 186), defendant has waived consideration of this issue. Moreover, we do not believe that the plain error doctrine applies in this instance because the evidence presented at trial was not closely balanced and the alleged

error was not so grave as to deny defendant a fair and impartial trial. See *People v. Turner* (1989), 128 Ill. 2d 540, 555, 539 N.E.2d 1196, *cert. denied* (1989), 493 U.S. 939, 107 L. Ed. 2d 326, 110 S. Ct. 337.

The State, in an attempt to reestablish Simpson's credibility, properly introduced evidence which supported Simpson's explanation of why he made inconsistent statements when he spoke with defendant's attorney. (See *People v. Fairbanks* (1986), 141 Ill. App. 3d 909, 915, 491 N.E.2d 74, *appeal denied* (1987), 113 Ill. 2d 579, 505 N.E.2d 357 (stating that where credibility is at issue, the circuit court should allow the parties "wide latitude" so that the jury has access to all the information and inferences necessary to evaluate credibility).) Although we consider Detective Foley's testimony concerning the charges levied against defendant's brother to have been improper bolstering, we do not deem it to have been a factor in defendant's conviction.

Defendant's last contention is that the circuit court improperly denied his section 2—1401 motion based on newly discovered evidence without first conducting an evidentiary hearing. He asserts that the court erred when it ruled that there had been a lack of diligence in procuring the evidence relied upon in the motion. The State responds that rather than file a motion under section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—1401 (now 735 ILCS 5/2—1401 (West 1992))), defendant actually attempted to file an untimely motion for new trial based on newly discovered evidence pursuant to section 116—1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1991, ch. 38, par. 116—1 (now 725 ILCS 5/116—1 (West 1992))). The State further asserts that the circuit court properly found that defendant failed to demonstrate that he had exercised due diligence in procuring the evidence. The State finally maintains that even if defendant was diligent in discovering the evidence, the evidence offered was not of such a conclusive character that a new trial would be warranted.

Following the jury's verdict of August 16, 1991, defendant filed a motion for a new trial based on newly discovered evidence on November 7, 1991. The motion alleged that subsequent to the trial, he discovered several witnesses who "have come forward with evidence that would have caused the jury to return a verdict of 'not guilty.'" The motion further alleged that neither defendant nor his attorney knew that the witnesses were acquainted with the facts of the case in such a manner that would affect the verdict. The motion listed Philip Balderos, Charles Spence, Sidney Plummer, Lawrence Studds, Keith Plummer, Rosita Balderos, and Anthony Balderos as

witnesses who have come forward, but only included affidavits from the last four.

Lawrence Studds stated in his affidavit that he lived at 1204 West Hastings, and that at a time when he was in a car with Philip Balderos and Simpson, Simpson told him that he held Roberts while Sidney Plummer beat him with a brick.

Keith Plummer stated in his affidavit that he lived at 1419 South Ashland, and on August 10, 1991, Simpson and J.P. Hallom told him that they were going to defendant's attorney's office.

Rosita Balderos stated that she lived at 1419 South Ashland, and on March 19, 1990, she saw Simpson, Sidney Plummer, and Roberts running with boxes. When she stopped and asked Roberts what they were doing, he replied that they had video cassette recorders and that he had given one each to Simpson and Plummer and that the rest were his. When Plummer and Simpson told Roberts that they each wanted another one, Roberts refused but Plummer stated that they would get them anyway. The three men then walked off together. She also stated that she knew that Simpson had spent a year in jail for stealing a purse and hitting the victim in the stomach with a brick, killing her unborn child.

Anthony Balderos stated that he lived at 1649 West 14th Street, and that on the day of Roberts' killing, he saw Simpson and noticed that he had various bruises on his face and body. When he asked where the bruises came from, Simpson told him that " 'he had just got through beating that mark.' "

Following a hearing, the court denied defendant's motion without conducting an evidentiary hearing, finding that defendant had failed to demonstrate that the witnesses could not have been located prior to trial with the exercise of due diligence. The court noted that even though all of the witnesses live in the same neighborhood and some were related to defendant, defendant offered nothing to suggest they could not have been found, interviewed, and produced at trial. The court further stated that even if defendant had exercised due diligence, all the proposed evidence was "merely contradictory" to the State's evidence at trial and did not justify granting a new trial.

•3 Despite the State's arguments that section 2—1401 is an improper means to challenge the jury's verdict, we find that it is an appropriate mechanism because it provides a method of attacking final orders, judgments, and decrees after 30 days from the entry of judgment. (Ill. Rev. Stat. 1991, ch. 110, par. 2—1401 (now 735 ILCS 5/2—1401 (West 1992)); *People v. Sanchez* (1986), 115 Ill. 2d 238, 284, 503 N.E.2d 277, *cert. denied* (1987), 483 U.S. 1010, 97 L. Ed. 2d 745, 107 S. Ct. 3240.) Because defendant here did not raise the issues until

after the expiration of the 30-day period available for the filing of the post-trial motion, it was proper for him to seek relief under section 2—1401.

Nevertheless, despite the appropriateness of the mechanism, we affirm the court's decision that defendant failed to exercise due diligence. In order to be entitled to relief under section 2—1401, the newly discovered evidence must be (1) so conclusive that it would probably change the result if a new trial is granted; (2) discovered after the trial; (3) of such character that it could not have been discovered prior to trial in the exercise of due diligence; (4) material to the issues; and (5) not merely cumulative to the trial evidence. (*Tuttle v. Fruehauf Division of Fruehauf Corp.* (1984), 122 Ill. App. 3d 835, 839, 462 N.E.2d 645.) The burden of proof on these factors is on the proponent of the motion (*People v. Velez* (1984), 123 Ill. App. 3d 210, 219, 462 N.E.2d 746), and the determination of the existence of these factors rests within the sound discretion of the circuit court and will not be reversed on appeal absent an abuse of that discretion (*National Bank v. Doss* (1986), 141 Ill. App. 3d 1065, 1071, 491 N.E.2d 106).

•4 In the instant case, the circuit court found that defendant failed to demonstrate that the witnesses could not have been discovered prior to trial in the exercise of due diligence, and there is nothing to indicate that such a finding constituted an abuse of discretion. Furthermore, it has been held that a finding of a lack of diligence is reason enough to deny the motion without first conducting an evidentiary hearing. See *People v. Nunez* (1984), 125 Ill. App. 3d 224, 230, 465 N.E.2d 581; *People v. Son* (1982), 111 Ill. App. 3d 273, 283, 443 N.E.2d 1115.

Finally, even if defendant had been diligent, we would be unable to conclude that the character of the proposed evidence was so conclusive that it would have likely changed the outcome of the trial. Most of the evidence was merely impeaching, and newly discovered evidence which has only the effect of impeaching, discrediting, or contradicting a witness is insufficient to justify a new trial. (*People v. Waldroud* (1987), 163 Ill. App. 3d 316, 319, 516 N.E.2d 623, *appeal denied* (1988), 119 Ill. 2d 572, 522 N.E.2d 1254.) Accordingly, the circuit court properly denied defendant's section 2—1401 motion without first conducting an evidentiary hearing.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN and McCORMICK, JJ., concur.