THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RONALD EGAN, Defendant-Appellant.

First District (5th Division) No. 77-171

Opinion filed October 13, 1978.

Jerome Feldman, of Chicago (Judith A. Halprin, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Kenneth T. McCurry, and Michael John Madden, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial, defendant was convicted of attempt murder, aggravated battery, and unlawful restraint (Ill. Rev. Stat. 1977, ch. 38, pars. 8—4, 12—4 and 10—3), and was sentenced to a term of 8 to 20 years. On appeal he contends that the evidence adduced at trial was insufficient to prove his guilt beyond a reasonable doubt and that the trial court erred when it: (1) permitted testimony concerning a picture of defendant and a coat he allegedly owned, (2) permitted cross-examination of a defense witness and of defendant on irrelevant matters which exceeded the scope of direct examination, (3) allowed hearsay testimony into evidence, and (4) allowed irrelevant rebuttal testimony into evidence.

The following pertinent evidence was adduced at trial.

*For the State*
*Donna Jean White*

On December 25, 1975, at approximately 12:30 a.m. she was a passenger on a northbound Kedzie Avenue C.T.A. bus. When the bus stopped at 59th Street to pick up a passenger, she noticed a man running to board it. After he boarded, she looked at him while he paid his fare and walked past her to the rear of the bus. The lighting conditions on the bus were very good and she observed that the man's nose was very red. When she got off at 56th Street and started to walk towards her home, she noticed that the man had also exited and had started walking down the street on the opposite side. When she reached the alley between Sawyer and Kedzie the man came up to her and grabbed her with his left hand. He had a gun in his right hand. He began to pull her into the alley which was well lighted. She was face to face with him and begged him to let her go. He pulled her into the alley with his arm around her neck while she cried "very loudly," refusing to respond to his directions to "shut up." The man then shot her twice in the chest from a distance of two or three feet and ran away down the alley in a northerly direction. She lost consciousness and, after being revived by Michael Frye, was taken to Holy Cross Hospital. One hour after being shot she described her assailant as a white male, 23 or 24 years of age, five feet and six or seven inches tall, with shoulder length greasy blond hair, blue eyes, a scar on the right side of his face near his mouth and wearing a black or dark brown leather jacket. Approximately one hour later, while awaiting surgery, the police showed her about eight photographs. The photograph she selected as that of her assailant was that of defendant, Ronald Egan. She again identified Ronald Egan in court as her assailant.

On cross-examination she admitted that although she did not know whether she received any medication prior to viewing the photographs, she had received oxygen through a mask for an hour and had been dizzy

and in intense pain. She admitted that Egan did not attempt to take any of her money or molest her, and that although his eyes were very glassy, she did not smell the odor of alcohol on him.

### Michael Frye

At approximately 1 a.m. on December 25, 1975, he left a tavern on 55th Street between Kedzie and Sawyer Avenues when he heard two loud noises coming from somewhere in front of him. He then saw, by very bright street lighting, a man whom he identified in court as Ronald Egan run from the alley onto Sawyer, past him and then into a gangway. He continued walking and heard a woman in the alley behind his house screaming, "I have been shot, help me." He went to this woman, who was Donna White, and later went to Holy Cross Hospital where she was taken by the police. The police there showed him approximately 100 photographs, and he chose one of Ronald Egan as being the man he had seen earlier running on Sawyer Avenue.

On cross-examination he admitted that between 10:30 p.m. and 1 a.m. on the night of the incident he consumed four 12 ounce bottles of beer. He acknowledged that the man who ran past him on Sawyer Avenue wore a dark brown or black leather jacket, had blond hair slightly longer than collar and ear length, and was approximately five feet six inches tall and of slender build.

### Kenneth Smith, Chicago Police Officer

At approximately 1:10 a.m. on December 25, 1975, he and his partner Dennis Heenan responded to a call to go to the alley at 56th and Kedzie where they found Donna White, who had been shot twice in the chest. After she was removed in a squadrol, he observed footprints in the snow leading north from the alley. He and his partner followed the footprints for several blocks until they ended next to a set of tire tracks in a parking lot. He observed an identical set of footprints leading from this spot to a bus stop on 59th and Kedzie. He went to the bus stop on 56th and Kedzie where he noticed similar footprints leading from there to the alley where he had found Donna White.

On cross-examination he admitted that he made no attempt to measure or take any impressions of the footprints which he observed. He acknowledged that his own shoe size was nine and a half, and that the shoe prints in the snow were approximately an inch and a half smaller than his own. He also acknowledged that he observed a horseshoe cleat covering the entire outside edge of the heels of the shoeprints.

### Thomas Gayner, Chicago Police Officer

At approximately 1:12 a.m. on December 25, 1975, he and his partner Officer Pedoraro responded to a radio call and went to 56th and Sawyer,

where he observed that Donna White had been shot twice in the chest. She was transported by squadrol to Holy Cross Hospital and he followed. He was informed there by police investigators Olson and Herman that two witnesses to the offense had identified a photograph of Ronald Egan. He went to Egan's home and talked to his mother who told him that Egan was not at home. Egan surrendered himself to the police on December 31, 1975.

*For the Defense*

*John Herman, Chicago Police Officer*

On December 25, 1975, at approximately 1 a.m., he went to the emergency room at Holy Cross Hospital and saw Donna White. She described the man who shot her as being a white male, five feet and six to nine inchess tall, weighing approximately 160 pounds, with blond hair and a three-quarter length black or dark brown leather jacket. He received six photographs from his partner police officer John Olson, who had shown them to a Michael Frye. He showed the photographs one at a time to Donna White, who pointed to the photograph of Ronald Egan as looking like the man who shot her. He accompanied several police officers to Egan's home, but did not see any footprints similar to those at the scene of the shooting.

On cross-examination, he acknowledged that Donna White had been receiving oxygen through a mask, but stated that before he showed her the photographs, a nurse took the mask off.

*Margaret Egan*

In the early morning hours of December 25, 1975, she told several police officers at her house that her son Ronald Egan had been home earlier, was not home at that time, and did not wear steel-toed shoes. She had seen her son at 5 p.m. on December 24, and next saw him at 11 a.m. on December 25. He was wearing a waist-length light tan leather jacket, but he did not own or wear a dark knee-length leather jacket.

On cross-examination she acknowledged that although the police had not told her that the girl who had been shot was in the hospital, her son knew this fact and indicated that he wanted to contact the police and go to see the girl.

*Thomas De Grado*

He owns a fruit stand at 63rd and Narragansett and lives in an apartment which he shared with Ronald Egan, and which is located at 6306 W. 63rd. On December 24, 1975, Egan worked with him at his fruit stand until he closed it at 8 p.m., after which Egan and several other men remained for over an hour and consumed most of a bottle of "Jack Daniel's" whiskey. He and Egan returned to the apartment sometime

after 10 p.m. Egan, who apparently was intoxicated, showered and lay down in the bedroom. Patti Solan arrived at the apartment at approximately midnight, and entered the same bedroom. He left the two of them alone in the apartment when he went out between 12:30 and 1 a.m., and observed that they were still together in the bedroom when he returned at approximately 2:30 a.m. He went to sleep, but was awakened at approximately 6 a.m. by Dan Egan, who went into the bedroom and told his brother that the police had been to their mother's house and that some girl had been shot. Ronald Egan and Patti Solan left together at approximately 8 a.m. He and Egan each had several pairs of shoes in the apartment, which they exchanged regularly and which were size nine. During the four months they shared the apartment, he never observed Egan wear shoes with cleats on them. Patti Solan had cut Egan's hair on December 21, 1975, and on December 24, it reached to just over his ears and the collar line at the nape of the neck.

On cross-examination, he did not recall whether Egan had a moustache on December 24, 1975. He acknowledged that he owned a waist-length leather jacket but stated that Egan never wore it, and that neither he nor Egan owned a brown or black three-quarter length leather jacket.

*Patricia Solan*

At approximately midnight on December 24, 1975, she went to Thomas De Grado's apartment where she saw Ronald Egan sleeping in the bedroom. She stayed there with him and never let him out of her sight through 10 a.m. on December 25, 1975, when they left the apartment together. She had never seen Egan wear shoes with horseshoe cleats. She had cut Egan's hair on December 21, and on the date of the offense it was above his collar.

On cross-examination, she acknowledged that she and Egan visited his mother at 11 a.m. on December 25, and discussed the fact that the police had been there earlier, but did not discuss a shooting or a girl in the hospital. On that morning Egan wore a waist-length tan leather jacket and he did not own nor had she ever seen him wear a three-quarter length black or brown leather jacket. She then admitted that a picture she kept in her bedroom, marked as People's Exhibit No. 4, was a photograph taken of Egan in 1974 which showed him wearing a hip-length dark leather jacket.

*Defendant Ronald Egan on his own behalf*

In October 1975, as a result of a motorcycle accident, he suffered two sprained ankles and a fractured third lumbar, so that as of December 31, 1975, when he surrendered himself to the police, he used a cane to walk with and was unable to run. He substantially repeated Thomas De Grado's account of the night of December 24, stating that his head

was spinning as a result of having too much to drink, and that he therefore fell asleep on the bed in De Grado's apartment shortly after 11 p.m. When his brother woke him up the following morning between 6 and 7 and told him that the police had looked for him at his mother's house, he observed that Patti Solan was in bed with him, but he did not know when she arrived there. He surrendered himself to the police on December 31, 1975, and his requests to be taken to the hospital and placed in a lineup were denied. He was not near 59th and Kedzie at 1 a.m. on December 25, and he did not shoot Donna White. On that date he was five feet eleven inches tall, his hair was above his collar, he owned several pairs of shoes which were all size nine, and none of his shoes had horseshoe cleats on them. The photograph numbered People's Exhibit No. 4 showed him wearing a black leather jacket which was approximately four inches below his waist in length, but he last wore that jacket in the winter of 1974.

On cross-examination, he acknowledged that when an examiner took his medical history upon his incarceration in Cook County jail, he did not mention his sprained ankles, and although he told the examiner he was five feet eleven and 175 pounds, the form which he signed stated that he was five feet nine and 150 pounds. He admitted that on December 24, he and two others drank three six packs of beer in Marquette Park before he went to De Grado's fruit stand, where he later had ten drinks of whiskey. He acknowledged that after his brother woke him up on the morning of December 25, he determined that the police were looking for him regarding a girl who had been shot, and he left De Grado's apartment to go to his mother's house. On the way he stopped at a 7-11 store where he spoke to a uniformed police officer who he described as being 29 years old, having brownish blond hair, being six feet tall and of medium build. He knew the officer only as "Ed," and had been a guest in his home in the vicinity of 36th and Damen. Ed told him that the police were looking for him in connection with the shooting of a girl who was in Holy Cross Hospital, and, although he did not arrest him, advised him to get some bond money together. He stated that police officer Ed Nakutis who was present at trial, was not the officer he spoke with in the 7-11 store.

*For the State on rebuttal*

*Edward Nakutis, Chicago Police Officer*

He has known Ronald Egan for approximately two years, had had him as a guest in his home in the vicinity of 36th and Damen, and frequently saw him in the 7-11 store at 67th and California. He was not in that store on December 25, 1975, and was not in uniform or on duty. He never talked with Egan regarding the shooting of Donna White.

*Ralph Bresnahan, Chicago Police Officer*

On December 25, 1975, from 7 a.m. throught 4:30 p.m., he was the Watch Commander for the Eighth Police District. The only officer named Ed under his command that day was Ed Gross, who was 56 years old, approximately five feet ten inches tall and had graying black hair. He had no officer under his command who was approximately 29 years old, had blonde hair, and lived near 50th and Damen.

*Joseph Curtin, Chicago Police Officer*

At 10:30 a.m. on December 31, 1975, while he was in charge of Area 3 homicide, Ronald Egan surrendered himself to his custody. Egan did not have a cane with him and he observed nothing unusual in his walk.

OPINION

■■ Defendant first contends that he was not convicted beyond a reasonable doubt. His initial argument in support of this contention is that the failure of Donna White to mention prior to trial that her attacker had a scar on his face, plus certain claimed inaccuracies in her description of his height and hair length and in the description given by Michael Frye, create a reasonable doubt as to the credibility of their identifications. We disagree. Where, as here, the identification of the accused is positive, precise accuracy in describing facial characteristics is unnecessary. (*People v. Jackson* (1974), 23 Ill. App. 3d 945, 320 N.E.2d 591.) The failure to mention the presence of a scar does not create a reasonable doubt as to guilt. (See *People v. Miller* (1964), 30 Ill. 2d 110, 195 N.E.2d 694.) It is for the trier of fact to resolve any questions of the credibility of witnesses, and Donna White's failure to mention the presence of a scar prior to trial certainly does not render her positive identification so improbable or unsatisfactory as to raise a reasonable doubt as to guilt. (*People v. Fabian* (1976), 42 Ill. App. 3d 934, 356 N.E.2d 982.) Further, an inaccuracy of two to three inches in the description of defendant's height and hair length, contrary to his argument, only affects the weight of the witnesses' testimony and does not destroy the credibility of their identification. (*People v. Carrol* (1973), 12 Ill. App. 3d 869, 299 N.E.2d 134, *cert. denied* (1974), 417 U.S. 972, 41 L. Ed. 2d 1144, 94 S. Ct. 3180; *People v. Calhoun* (1971), 132 Ill. App. 2d 665, 270 N.E.2d 450.) It has been repeatedly established that the identification testimony of a single witness, even if it be that of a crime victim, is sufficient to convict if the identification is positive and the witness is found to be credible. (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631; *People v. Henderson* (1976), 36 Ill. App. 3d 355, 344 N.E.2d 239.) In the instant case, Donna White and Michael Frye viewed defendant at close range under well-lit conditions. They both examined photographs soon after the occurrence and positively identified defendant's photograph as the picture of the man

who committed the offense. They positively identified defendant as the attacker again at trial. We conclude that the identification testimony adduced in this case was more than sufficiently positive and credible to support defendant's conviction beyond a reasonable doubt. The inaccuracies pointed out by defendant are minor in nature and in view of the overwhelming evidence of his guilt clearly do not warrant reversal. See *People v. Gibson* (1978), 56 Ill. App. 3d 400, 372 N.E.2d 132.

■■ ■ In his remaining reasonable doubt arguments, defendant initially cites the fact that a police officer arriving at the scene of the crime testified that shoe prints found in the snow had a horseshoe dent on the outer portion of the heel, and appeared to be an inch and a half smaller than those left by his own size nine and a half shoe. Defendant argues that since his shoe size is a size nine, and according to his and other defense witnesses' testimony, he did not own a pair of shoes with horseshoe cleats, a reasonable doubt is cast upon his identification as the offender. We reject this argument. The trier of fact, as we stated above, properly determines and resolves any questions concerning the credibility of witnesses. (*People v. Dillon* (1975), 28 Ill. App. 3d 11, 327 N.E.2d 225.) The trial court was certainly not bound to accept the testimony of certain defense witnesses that defendant did not own a pair of shoes with horseshoe cleats, or find that said testimony overcame defendant's positive identification. Moreover, defendant concedes that no measurement of the shoe print was taken. It was not demonstrated in any way whether the shoe print of the attacker who ran from the shooting would accurately reflect his shoe size. It was likewise not demonstrated whether the police officer's estimated comparison of the shoeprints would accurately establish the degree, if any, to which the shoe size of the attacker was smaller than his own. Defendant's speculation on this point certainly does not amount to evidence which is so improbable or unsatisfactory that it leaves a reasonable doubt as to defendant's guilt and therefore warrants reversal of the trial court's determination. (*People v. Mills* (1968), 40 Ill. 2d 4, 237 N.E.2d 697.) We also reject defendant's final argument under the reasonable doubt heading, in which he attacks the trial court for apparently accepting as credible that defense testimony which described defendant's intoxication, but not the remainder of the testimony which gave defendant's alibi and explained his whereabouts during the offense. Although defendant argues that the improperly overlooked testimony raised a reasonable doubt as to guilt, he overlooks the fact that it is fully within the prerogative of the trial court, acting as trier of fact and determining the credibility of witnesses, to accept some of a witness's testimony and reject the rest. (*People v. Brown* (1974), 19 Ill. App. 3d 757, 312 N.E.2d 789.) While the circumstances of defendant's

intoxication were testified to by defense witnesses without contradiction, the alibi testimony was directly refuted by the positive identification of the witnesses to the offense. Based on all of the above, we conclude that the evidence adduced at trial provided an ample basis for the trial court to find defendant guilty beyond a reasonable doubt.

Defendant next contends that the trial court erred when it permitted testimony regarding a photograph taken in 1974 and the dark leather jacket he was wearing in that photograph. Defendant argues that since the photograph was taken a year prior to the attack on Donna White and was not admitted into evidence, testimony about it only created a prejudicial inference that defendant was the man who wore a similar jacket and committed the offense in 1975. We reject this argument. As defendant concedes, the trial court refused to allow the photograph to be admitted into evidence. In lengthy remarks which explained its verdict, the trial court mentioned a jacket only in connection with Donna White's identification testimony, and made no mention of the photograph or testimony of which defendant complains. A trial judge, sitting as trier of fact, is presumed to consider only competent evidence in reaching a decision. (*People v. Earl* (1966), 34 Ill. 2d 11, 213 N.E.2d 556.) There is nothing in the record or defendant's argument which in any way overcomes that presumption or establishes that any prejudice was suffered.

We likewise reject defendant's argument that prejudicial error was committed when the court allowed the State to cross-examine defendant and another defense witness regarding activities which were irrelevant and beyond the scope of direct examination. We note initially that much of the testimony complained of was ordered stricken by the trial court on defendant's objection. Moreover, defendant had not shown that he in any way suffered any prejudice from the complained of testimony. Defendant cites *People v. Kirkwood* (1959), 17 Ill. 2d 23, 160 N.E.2d 766, *cert. denied* (1960), 363 U.S. 847, 4 L. Ed. 2d 1730, 80 S. Ct. 1623, in which error was found when the State asked questions regarding irrelevant matters, not brought out on direct examination, for the purpose of introducing evidence contradicting the answers and impeaching the defendant. In the instant case, however, the State did not impeach or contradict the answers elicited on cross-examination. Those answers themselves, which related to defendant's activities on the day after the offense, had no bearing on the offense committed, were not inherently prejudicial, and do not appear from the record to have caused any prejudice to result. Defendant's argument that the trial court was improperly influenced and a fair trial was denied must therefore be rejected.

■■ Defendant also contends that hearsay testimony was improperly

admitted when a police officer testified that in the course of his investigation, defendant's mother told him that defendant was not at home. Hearsay evidence consists of statements made out of court offered to show the truth of the matter asserted, and therefore resting on the credibility of the out of court asserter. (*Hansel v. Chicago Transit Authority* (1971), 132 Ill. App. 2d 402, 270 N.E.2d 553.) The trial court stated that the testimony defendant complains of was being admitted only to show how the police officer conducted his investigation, rather than for the truth of the matter asserted. As testimony which reflected an investigatory procedure entirely within the officer's personal knowledge, its admission was proper. (*People v. Coleman* (1974), 17 Ill. App. 3d 421, 308 N.E.2d 364.) Moreover, the declarant in this case, defendant's mother, was not only present in court, but was called by the defense to testify and recounted exactly the same conversation and information which defendant now attacks as hearsay. That testimony was therefore merely cumulative, and any error involved in its admission was harmless. *People v. Daliege* (1976), 40 Ill. App. 3d 706, 352 N.E.2d 247.

■■ Finally, defendant argues that the court erred by admitting certain testimony offered in rebuttal to his claim that he discussed shooting of a girl with a uniformed police officer named "Ed" in the 7-11 store. Defendant argues that since the State's rebuttal evidence did not directly contradict, repel or disprove his assertion (see *People v. Sepka* (1977), 51 Ill. App. 3d 244, 367 N.E.2d 138), its admittance into evidence was error. Although portions of the rebuttal evidence did tend to render defendant's assertion implausible, a review of the record sustains defendant's argument that the standard for admitting rebuttal testimony was not entirely met and some error was therefore committed. We have held, however, that the decision to permit rebuttal testimony rests largely in the discretion of the trial court, and will not be reversed on appeal unless that discretion has been abused and defendant is thereby prejudiced. (*People v. Thornton* (1977), 54 Ill. App. 3d 202, 369 N.E.2d 358.) Although he alleges prejudicial error, defendant has not attempted to show, nor can we detect from the record, any way in which prejudice occurred due to the admission of the rebuttal testimony. In light of that fact and the overwhelming evidence against defendant, his conviction will not be set aside on this review.

Based on the foregoing, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.