RICHARD DOE, a Minor, By His Natural Parents and Next Friends, John Doe, *et al.*,[1] Plaintiffs-Appellants, v. ROBERT J. LUTZ, Defendant-Appellee (Alice Halpin *et al.*, Defendants).

First District (2nd Division)   Nos. 1—94—4147, 1—95—3731 cons.

Opinion filed May 10, 1996.—Rehearing denied June 20, 1996.—Modified upon denial of rehearing June 25, 1996.

---

[1]Throughout this opinion, we use for plaintiffs' actual names the pseudonyms under which these cases were filed. In response to our inquiry at oral argument on appeal, plaintiffs' counsel said that anonymity was not necessary to protect plaintiffs because there had been no act of sexual penetration. Plaintiffs subsequently requested anonymity based upon concern for "Richard's" present mental condition. We have opted to honor that request.

632

Thomas D. Decker, of Thomas Decker & Associates, and Sherman C. Magidson and Scott T. Kamin, both of Magidson & Sullivan, both of Chicago, for appellants.

Arlene C. Erlebacher, Susan A. Stone, and Theodore R. Scarborough, all of Sidley & Austin, of Chicago, for appellee.

JUSTICE DiVITO delivered the opinion of the court:

"Richard Doe," by his parents referred to herein as "John Doe" and "Jane Doe," filed an action against Robert Lutz, the pastor of St. Norbert's Parish, Alice Halpin, the principal of St. Norbert's School, and others alleging instances of verbal, physical, sexual, and emotional abuse directed against Richard while he was a first- and second-grade student at St. Norbert's School from 1986-88. A jury found for defendants. Plaintiffs subsequently filed a section 2—1401 motion for a new trial which was denied. 735 ILCS 5/2—1401 (West 1992). Plaintiffs now maintain, in this consolidated appeal of only the judgments for Lutz, that numerous errors occurred during the trial and that the circuit court erred in denying his section 2—1401 motion. For the following reasons, the judgments of the circuit court are affirmed.

THE ALLEGATIONS OF ABUSE

At trial, Richard testified that during the first and second grades he was involved in numerous playground fights. Although the playground was patrolled by adults, other children, including G.D., ganged up on Richard in an area that could not be seen by the patrollers. These incidents often resulted in Richard being sent to Halpin's office.

During first grade (1986-87), Richard was sent to Halpin's office four or five times. Each time, Halpin and Lutz were present. They would close the door and say such words as "asshole" and "fucker." Once or twice, Lutz threatened to kill Richard and his parents if he told anyone about what had occurred.

During second grade (1987-88), Richard was sent to Halpin's office four or five times. Once again, Halpin and Lutz were present on each occasion, and they closed the door and said "asshole" and "fucker" to him. The following incidents of physical and sexual abuse also occurred: Lutz hit Richard in the groin and stomach once or twice, Lutz and Halpin once rolled on the ground unclothed, Lutz kicked Richard in the face while wearing his shoes (although Richard was not knocked down or bruised), and Lutz rubbed his penis against Richard's face and "butt" while Richard was unclothed. All of the alleged incidents occurred during the 15-minute recess periods.

Alice Halpin denied each of Richard's allegations. She did not recall any contact with Richard during first grade, and her contact in second grade was limited to two occurrences. Once, her secretary

brought Richard, who had a bloody nose, to Halpin's office door, but he did not enter. On another occasion, Mrs. Briggs, a playground supervisor, brought five or six students into Halpin's office at the end of a playground period. Richard had screamed in another boy's face, the boys began pushing each other, and a scuffle had broken out. Everyone apologized and was sent back to class.

Halpin also testified that she and Lutz were never in her office with a child for any reason.

Father Lutz, a priest for 44 years, denied each of Richard's allegations. He was never in Richard's presence except during religious services when Richard was with his parents. He stopped by Halpin's office for a few minutes every couple of days. If Halpin was talking with a student, he would only say hello. If he needed to talk with Halpin, the student would leave.

Paula Greene, Richard's second-grade teacher and a close friend of the Does, testified that she knew of only one occasion when Richard was sent to Halpin's office. After he and G.D. scuffled, both visited the office and returned to class acting normally.

Dorothy Cacioppo, the school secretary who worked outside of Halpin's office, testified that she did not see Richard visit Halpin's office on multiple occasions as he alleged. Cacioppo also denied that Halpin ever screamed or swore at children.

THE REVELATIONS OF ALLEGED ABUSE

Jane Doe, an attorney who represented abused children at the public guardian's office for $4^{1}/_{2}$ years, testified that Richard began performing poorly in school and acting oddly at home during the second grade. She contacted Paula Greene; Dr. Anne Brown, a clinical psychologist; and Dr. Rita Sussman, a psychologist. Over the course of seven sessions with Richard, Sussman performed educational testing and a psychological diagnostic evaluation. Sussman found that Richard suffered from profound anxiety and he had difficulty living up to his parents' expectations. She recommended that Richard see an educational specialist and a psychotherapist. During one session which Jane and John Doe attended, Richard said that he was regularly being beaten up on the playground. Richard began seeing a reading therapist, but he did not enter psychotherapy.

John Doe, an attorney in private practice, testified that on July 19, 1988, he and his wife met with Lutz and told him about the playground beating accusations. Lutz did not know anything about the fighting and suggested that they speak with Halpin. On July 21, the Does met with Halpin, and she said that the children were being watched and no beatings had occurred. Halpin said that Richard

must have imagined the beatings. The meeting turned confrontational and John announced that Richard would be removed from the school.

Greene testified that the Does visited her at her home on the evening of July 21 and, in Richard's presence, John, in a rage, vowed to get even with the church and hit it "in the pocketbook, *** the only place they care about."

Jane testified that shortly more than a week later, on July 30, 1988, Richard asked if he could have a meeting about St. Norbert's with John and her. Anticipating the importance of the conversation, she tape recorded the event. At the meeting, Richard, while receiving praise and encouragement from his parents, accused Halpin of threatening to "melt [his] brain" and "dissect" him; of calling him a "clown," "asshole," and "dorkus"; and of saying "poop on your father" and "your mother [is] a fucker."

Richard testified that he could not remember the meeting.

Kate Greene, Paula's daughter, testified that in September 1988, while she was babysitting for Richard, she witnessed him standing under the water in a neighbor's pool. Upon being asked what he was doing, Richard said he was trying to kill himself because no one liked him.

John Doe testified that in September and October 1988, Richard told Jane and him that Halpin had slapped G.D. and him and called them "fucking assholes" and Lutz had punched and kicked them.[2] On October 23, John Doe filed a complaint on behalf of Richard with the Northbrook police.[3] John acknowledged that he was considering a lawsuit prior to learning of the physical abuse allegations.

Upon the advice of Dr. Brown, John began to have weekly "special time" meetings with Richard in October. On January 12, 1989, at a "special time" dinner, Richard told John for the first time that Lutz and Halpin had sexually abused him. On January 19 and 26, at "special time" dinners, Richard made further allegations of sexual abuse. John took notes after each meeting and converted the notes into memoranda the following day.

John also testified that Richard began having frequent nightmares in third grade involving Lutz and Freddy Krueger, a character from the horror film "Nightmare on Elm Street."

---

[2]G.D. testified that neither Halpin nor Lutz ever hit, kicked, or swore at him. Nor did G.D. witness any of these things happen to Richard.

[3]The police, the mass molestation unit of the State's Attorney's office, and the Department of Children and Family Services (DCFS) conducted an investigation. No criminal charges were filed against Lutz or Halpin.

THE EXPERT TESTIMONY

Dr. Anne Brown testified for the Does that she engaged in numerous diagnostic and therapeutic sessions with Richard beginning in March 1989. She concluded that Richard was suffering from posttraumatic stress syndrome and had experienced traumatic abuse at St. Norbert's connected with Lutz and Halpin. Brown based her conclusions on her multiple observations of Richard and on an examination and comparison of numerous drawings he made at school and in sessions with her. The drawings executed in her presence were part of a testing procedure called "projective drawings." Brown did not consider herself to be an expert in projective drawings. She also acknowledged that, in violation of standard testing protocol, she drew material portions of some pictures herself and instructed Richard to complete the drawings.

During a therapy session on June 9, 1989, Richard told Brown that Lutz and Halpin had rolled around on the floor without their clothes, Lutz had hit and kicked him, and Lutz had rubbed his penis in Richard's face. Brown also testified that Richard was capable of fabricating a story.

Dr. Chester Scrignar, a psychiatrist specializing in posttraumatic stress disorder, testified for the Does that after conducting a mental status examination of Richard, he concluded that Richard was suffering from posttraumatic stress disorder as a consequence of the physical and sexual abuse he had experienced.

Dr. David Scott Levin, a clinical psychologist specializing in child and adolescent psychology, testified for the Does that interviews with Richard and an examination of Richard's drawings indicated that he was suffering from posttraumatic stress disorder. Levin explained that "projective testing," of which drawings are a form, is a regular component of his evaluation of nearly all his child and adolescent patients. He maintained that projective testing is a common procedure used in major teaching and research hospitals and clinics to evaluate children.

Dr. Ian H. Gotlib, a research and clinical psychologist specializing in the diagnosis and treatment of depression, testified for Lutz that based on test results from the Minnesota Multiphasic Personality Inventory, Richard was not suffering from posttraumatic stress disorder, depression, or a generalized anxiety disorder. Gotlib explained that he does not perform projective testing because projective techniques have not been shown to be valid assessment tools. He estimated that 75% of graduate programs in clinical psychology do not teach projective drawings. Also, after reviewing the deposition and trial testimony of Dr. Brown and viewing video of Richard exe-

cuting projective drawings under Dr. Brown's supervision, Gotlib stated that Brown violated professional testing protocols when administering the projective drawing tests.

Dr. Elizabeth Loftus, a research psychologist specializing in memory and memory distortion, testified for Lutz about the nature of "false memory." She said it is a memory of something that did not occur. The person experiencing the false memory is unaware that it is false. False memories are created from pieces of information that a person picks up from different sources. Suggestive or leading questioning can result in the creation of false memories. Children are particularly susceptible to the creation of false memories through suggestion.

Dr. Kathleen May Quinn, a forensic and child psychiatrist, testified for Lutz about the clinical credibility of the sexual abuse allegations. After reviewing depositions, school and medical records, video tapes, and trial testimony, Quinn concluded that Richard was vulnerable to two sources of contamination: repetitive questioning by his parents and leading and suggestion by professionals. Quinn noted that the allegations occurred in a context of increasing hostilities between the Does and St. Norbert's, and the Does were searching for explanations outside of the family to account for Richard's difficulties. Quinn also explained that Richard's allegations were "unusual" in that most instances of child sexual abuse involve verbal and physical grooming to entice the child to participate and cooperate, involve only one adult, and occur in secret locations unlike a principal's office in the middle of the school day.

At the close of evidence, the jury returned a verdict in favor of Lutz and Halpin.

I

Plaintiffs contend that the circuit court erred in refusing to allow prior-bad-acts testimony from Mildred Nigrelli and D.Y.

Nigrelli, a former principal at St. Mary's Parish, filed an employment discrimination suit against St. Mary's after she was not rehired as principal. Lutz was the pastor at St. Mary's during Nigrelli's tenure. Although Nigrelli's suit did not name Lutz as a defendant, her complaint alleged that he sexually harassed her by seeking sexual contact and striking her with his hand.

D.Y., a boy one grade ahead of Richard at St. Norbert's, filed a civil action against Lutz alleging acts of physical and sexual abuse. D.Y. alleged that Lutz sexually assaulted him in school bathrooms on three occasions: once after he was summoned to Halpin's office and twice after Lutz requested his help with chores after Mass. On the

latter two occasions, Lutz played child games such as peek-a-boo with D.Y. prior to the assaults.[4]

■ Plaintiffs contend that the Nigrelli and D.Y. evidence was relevant to show that Lutz repeatedly used his position of authority as a priest to compel his victims to submit to his desires. Plaintiffs assert that this evidence was admissible based upon traditional relevancy considerations: it corroborated Richard's claim that Lutz used his priestly authority to gain access to and abuse those who came within his authority. Plaintiffs cite no authority allowing admissibility of prior bad acts on the ground they proffer. We reject this relevancy argument and note that evidence of prior bad acts is not admissible to show a defendant's character or propensity to commit the alleged crime. *People v. Kimbrough*, 138 Ill. App. 3d 481, 484, 485 N.E.2d 1292 (1985), *appeal denied*, 111 Ill. 2d 575, 488 N.E.2d 272 (1986). Here, testimony about other allegations of abuse by Lutz would have been highly inflammatory and prejudicial.

Moreover, the Nigrelli and D.Y. evidence was not admissible to prove Lutz's *modus operandi*. *Modus operandi* evidence, admissible as an exception to the prior-bad-acts rule, shows a method of behavior that is so distinct that separate wrongful acts are recognized to be the handiwork of the same person. *Kimbrough*, 138 Ill. App. 3d at 486-87; *People v. Cruz*, 162 Ill. 2d 314, 349, 643 N.E.2d 636 (1994).

Nigrelli's accusation that Lutz made sexual advances toward her, as an adult woman, does not share distinct, common features with Richard's allegations that Lutz and Halpin, acting together, physically, verbally, and sexually abused him in the principal's office. Both allegations contain physical and sexual elements. However, the common features are not sufficient to indicate the "handiwork" of the same person.

Although D.Y.'s allegations involve the sexual abuse of a young boy at St. Norbert's, they differ from Richard's allegations in several aspects. Richard claimed to have been physically and sexually assaulted by both Lutz and Halpin in Halpin's office during the school day. D.Y. claimed that Lutz acted alone, the abuse occurred in bathrooms, Lutz did not physically batter D.Y., two of the incidents occurred after Mass, and Lutz attempted to entice him by playing games. The differences are substantial enough to preclude the sets of allegations from being deemed evidence of *modus operandi*. Accordingly, the circuit court did not err in excluding testimony about Lutz's alleged prior bad acts.

---

[4]In a deposition for D.Y.'s action, Rosalie Price, a psychiatrist who conducted over 20 therapy sessions with D.Y., testified that D.Y. admitted to her that he lied about the Lutz accusations and that Lutz never touched him.

## II

On direct examination, Dr. Quinn testified that Richard's allegations of abuse were "unusual" because they did not contain any reference to grooming. On cross-examination, plaintiffs' counsel sought to question Quinn about whether the lack of grooming indicated the presence of a disorder, such as sadism, in the perpetrator. The circuit court sustained a defense objection and stated that no claim of an adult disorder had been raised in the pleadings and "we're not here to prove sadism."

■ Plaintiffs contend that the circuit court erred in limiting the cross-examination of Dr. Quinn concerning sadism. The scope of cross-examination is limited to the subject matter of direct examination, and the extent of proper cross-examination is within the broad discretion of the circuit court. *Bell v. Mill*, 271 Ill. App. 3d 224, 231, 648 N.E.2d 170 (1995). Here, the circuit court acted within its discretion because the question of whether Lutz was a sadist was not before the jury and was not raised by the testimony of Dr. Quinn on direct examination.

## III

Plaintiffs contend that the circuit court erred in excluding the testimony of four rebuttal witnesses. The decision to permit or exclude rebuttal testimony is within the discretion of the circuit court and will not be overturned absent an abuse of that discretion. *People v. Egan*, 65 Ill. App. 3d 501, 511, 382 N.E.2d 477 (1978).

### A

■ Plaintiffs offered the rebuttal testimony of Dr. David Scott Levin to contest Dr. Quinn's testimony that the absence of grooming is "unusual" in child sexual abuse cases. The circuit court properly prohibited Levin's testimony because, as it indicated, such testimony would have been ineffective if it did not broach the topic of sadism which, as discussed above, was not relevant evidence.

### B

■ In rebuttal, plaintiffs also offered the "newly discovered" testimony of M.P., a student at St. Norbert's, and G.P., his mother. M.P. would have testified that Richard received regular beatings on the playground outside the view of supervisors. G.P. would have testified that Halpin kept her office door closed and verbally abused children. Plaintiffs knew of both witnesses for over five years and did not contact them out of fear that they supported defendants. As the circuit court stated, rebuttal is not the time for discovery. The circuit court acted within its discretion in barring the proffered testimony.

## C

Plaintiffs also offered the "newly discovered" rebuttal testimony of Robert Seaverns, a widower of a person formerly associated with St. Norbert's. Seaverns would have testified that Halpin had a poor reputation for truthfulness and abusiveness to children. Plaintiffs have waived their objection to the rejection of Seaverns' testimony for failure to make a sufficient offer of proof. *People v. Andrews*, 146 Ill. 2d 413, 421, 588 N.E.2d 1126 (1992).

■ At trial, plaintiffs stated merely that Seaverns became familiar with operations at St. Norbert's through his wife and he would testify that Halpin had a poor reputation in the community for truthfulness and verbal abusiveness to children. Lutz contends that Seaverns' testimony was inadmissible hearsay because Seaverns would have testified about what his deceased wife told him about what others in the community said about Halpin's reputation. Hearsay is an out-of-court statement, offered to prove the truth of the matter asserted. *Laughlin v. France*, 241 Ill. App. 3d 185, 192, 607 N.E.2d 962 (1993), *appeal denied*, 151 Ill. 2d 565, 616 N.E.2d 336 (1993). We cannot evaluate that contention because plaintiffs' offer of proof was vague. Plaintiffs did not explain whether Seaverns would testify to his own knowledge of Halpin's reputation or to his wife's opinions or her knowledge of Halpin's reputation. As the offer of proof was insufficient to enable us to determine whether the exclusion of evidence was proper (*Andrews*, 146 Ill. 2d at 421), plaintiffs' argument must be rejected.

## IV

■ Plaintiffs contend that the circuit court erred in denying admission of one of Richard's drawings and of the memoranda that John Doe created after his "special time" dinner discussions with Richard. At trial, plaintiffs sought to have these exhibits admitted as substantive evidence. Now, for the first time on appeal, plaintiffs argue that the evidence should have been admitted because it was relied upon by their experts. However, plaintiffs have waived this argument for failing to raise it in the circuit court. *Eagan v. Chicago Transit Authority*, 158 Ill. 2d 527, 534, 634 N.E.2d 1093 (1994). Nevertheless, the circuit court's rulings in denying admission of the evidence were proper.

## A

The drawing, produced under Dr. Brown's supervision and

referred to as the "I'm with Stupid" drawing,[5] appears to depict contact between Lutz's penis and Richard's head. Despite its appearance, the drawing was supposed to illustrate Lutz shoving Richard with an arm, not contact with his penis. The circuit court refused to admit it into evidence, declaring it to be "highly inflammatory." Plaintiffs contend that the drawing should have been admitted into evidence because Dr. Brown and Dr. Levin relied on it to reach their conclusions about Richard. However, a circuit court may refuse to allow an expert to state the underlying basis for an opinion if the probative value of that basis pales beside a likely prejudicial impact or tendency to create confusion. *City of Chicago v. Anthony*, 136 Ill. 2d 169, 185, 554 N.E.2d 1381 (1990), *cert. denied*, 498 U.S. 900, 112 L. Ed. 2d 214, 111 S. Ct. 256 (1990). Considering that Dr. Brown and Dr. Levin were permitted to testify at length about other drawings that they relied upon, the ruling denying admissibility of this drawing was not erroneous.

### B

In denying the substantive admission of John's "special time" memoranda, the circuit court ruled that they lacked reliability. It did so because of the differences between the statements in the memoranda and Richard's statements in discovery and at trial. Also, there was considerable delay between the time of the alleged abuse and the memoranda. This ruling, apart from plaintiffs' belated allegation that Dr. Brown and Dr. Scrignar relied upon them in making their evaluations of Richard, justified the court's refusal to admit the memoranda.

### V

On cross-examination, Dr. Brown was impeached by reference to two Illinois Appellate Court cases that specifically questioned her credibility and objectivity. Plaintiffs contend that the circuit court erred in allowing the impeachment. However, plaintiffs have waived review by failing to include this alleged error in their post-trial motion. *Hollembaek v. Dominick's Finer Foods, Inc.*, 137 Ill. App. 3d 773, 780, 484 N.E.2d 1237 (1985).

### VI

Plaintiffs filed a section 2—1401 motion for a new trial based on the prior-bad-acts testimony of L.P. After reading newspaper ac-

---

[5]The drawing was so designated because it depicts "Richard" wearing a T-shirt with the inscription "I'm with Stupid" with an arrow pointing to the character depicted as Lutz. Plaintiffs concede that there is no allegation that Richard ever wore such a shirt during any alleged abuse in this case.

counts of the action against Lutz in 1989 and 1994, L.P. contacted plaintiffs' counsel and notified him that she had been sexually abused by Lutz in 1955 when she was in eighth grade.

Another judge considering the issue in the absence of the trial judge, who had by that time retired, denied plaintiffs' motion on the basis that the new evidence was not admissible at trial and plaintiffs were not diligent in bringing the evidence to the court's attention.

■ Plaintiffs contend that the denial was erroneous. To warrant relief under section 2—1401 (735 ILCS 5/2—1401 (West 1992)), newly discovered evidence must be so conclusive that the result of a new trial would probably be different, and the moving party must act with due diligence in discovering and bringing forward the evidence. *People v. Hallom*, 265 Ill. App. 3d 896, 906, 638 N.E.2d 765 (1994), *appeal denied*, 158 Ill. 2d 558, 645 N.E.2d 1362 (1994). Here, the newly discovered evidence would not have been admissible so the result of the trial could not have been different.

Again, plaintiffs seek to admit testimony of alleged prior bad acts by Lutz. As previously discussed, evidence of prior bad acts is not admissible to show a defendant's character or propensity to commit the alleged crime. *Kimbrough*, 138 Ill. App. 3d at 484. Plaintiffs, once again, contend that the proffered evidence meets the *modus operandi* exception. *Modus operandi* is a method of working that is so distinct that separate wrongful acts are recognized to be the handiwork of the same person. *Kimbrough*, 138 Ill. App. 3d at 486-87. L.P.'s accusations are not sufficiently similar to Richard's to evidence a distinct pattern of handiwork. Unlike Richard's version, L.P. alleged that, nearly 40 years before, Lutz acted alone and he did not use physical violence or abusive language. Also, L.P. was much older than Richard, and Lutz allegedly used a grooming-like approach to gain her acquiescence. As this testimony would not have been admissible at trial, the circuit court did not err in denying the section 2—1401 motion for a new trial.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN, P.J., and SCARIANO, J., concur.